BRETT A. AXELROD, ESQ.
Nevada Bar No. 5859
AMANDA A. HUNT, ESQ.
Nevada Bar 12644
**FOX ROTHSCHILD LLP**
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
Telephone: (702) 262-6899
Facsimile: (702) 597-5503
Email: baxelrod@foxrothschild.com
*[Proposed] Counsel for Bishop Gorman Development Corporation*

| Electronically Filed April 17, 2017 |
| --- |

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEVADA

| | |
| --- | --- |
| In re:<br><br>BISHOP GORMAN DEVELOPMENT CORPORATION, a Nevada nonprofit corporation,<br><br>          Debtor. | Case No. BK-S-17-11942-abl<br><br>Chapter 11<br><br>**OMNIBUS DECLARATION OF DEACON ARUNA SILVA IN SUPPORT OF (I) FIRST DAY MOTIONS AND (II) RELATED RELIEF**<br><br>Hearing Date:  OST PENDING<br>Hearing Time:  OST PENDING |

I, Deacon Aruna Silva, being duly sworn, hereby depose and declare under penalty of perjury:

## I.

## PROCEDURAL POSTURE/RELIEF SOUGHT:

1.     I am over the age of 18, am mentally competent, I have personal knowledge of, and am competent to testify to the facts contained in this declaration, except those matters based upon information and belief and, as to such matters, I believe them to be true.

2.     I currently serve as Executive Director of Bishop Gorman Development Corporation (the "Debtor" or "BGDC"), and I signed Debtor's bankruptcy petition in that capacity.  I was authorized by a resolution of Debtor's Board of Directors, dated March 31, 2017, (the "Board

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1

Resolution") to: (a) cause a bankruptcy petition to be filed on Debtor's behalf, (b) to enter into a stipulation and agreement with Bank of America, N.A. for the use of cash collateral (as discussed in greater detail below), (c) to enter into an agreement with Service Campaign Corporation ("SCC") for SCC to provide Debtor with post-petition financing, and (d) more generally, to cause to be filed and/or completed all documents, petitions, pleadings, and other instruments necessary for the initiation and continued prosecution of Debtor's chapter 11 bankruptcy case.  It is my understanding that a signed copy of the Board Resolution shall be filed at or near the time of the filing of this Declaration with the Bankruptcy Court.

3.      I hereby make this declaration in support of Debtor's First Day motions which Debtor now brings before the Court in an effort to (i) help stabilize Debtor's operations as it enters bankruptcy and (ii) avoid immediate and irreparable harm to Debtor, its estate, and creditors.

4.      Debtor hereby seeks First Day relief on an emergency basis with respect to the following three (3) separate matters: (1) Debtor's motion to approve on an interim basis, and set a final hearing with respect to, Debtor's stipulation with Bank of America for the use of cash collateral and provision of adequate protection to Bank of America in connection with the same (ECF No. 12); (2) Debtor's motion seeking the Court's authorization to maintain its existing cash management system (ECF No.11); and (3) Debtor's motion for an extension of time to file schedules, statements, lists and other documents required to be filed under 11 U.S.C. § 521 and Rule 1007 of the Federal Rules of Bankruptcy Procedure.  The factual support for each of these motions is set forth below in greater detail.

## II.
### BACKGROUND – BRIEF SUMMARY OF DEBTOR'S HISTORY, CONNECTION TO BISHOP GORMAN HIGH SCHOOL, AND DEBTOR'S DISPUTE WITH J.A. TIBERTI COMPANY

**A.      A Brief Summary of Debtor's History, Business Operations, Connection to Bishop Gorman High School, and Debtor's dispute with J.A. Tiberti Company**

5.      Debtor was organized on February 6, 2003, to raise funds for and to construct Bishop Gorman High School's current campus, buildings, and other related facilities (collectively the "Project") in Las Vegas, Nevada and to lease the Project to The Roman Catholic Bishop of Las

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE\44565139.v7-4/17/17

Vegas and His Successors, a Corporation Sole to operate Bishop Gorman High School ("BGHS" or the "School"). The Project owned by BGDC is located at 5959 S. Hualapai Way in Las Vegas, Nevada, bearing the Clark County Assessor's Parcel No. 164-36-601-005. The majority of the Debtor's revenues come from rental income, charitable donations and fundraising events. Debtor is a not-for-profit organization exempt from income taxes under Section 501(c)(3) of the Internal Revenue Code and is classified as a publically supported organization under Internal Revenue Code section 509(a)(1).

6. Debtor has a rental lease agreement dated as of December 1, 2011 (the "Lease")[1] with The Roman Catholic Bishop of Las Vegas, and His Successors, a corporation sole ("Tenant" or "Guarantor") to lease the Project and operate BGHS at the Project site from Debtor. The current monthly rent is $136,250, and the Lease expires in November 2061. The Lease provides for the Tenant to assume all duties and obligations with relation to the Project, including assessments and taxes. A true and correct copy of the Lease is attached hereto as **Exhibit 1**.

7. BGHS, through its affiliation with the Tenant, makes use of the Project for its operations. BGHS has a long, rich history in Southern Nevada. BGHS, formerly located at 1801 S. Maryland Parkway, began over sixty years ago as the vision and dream of five outstanding individuals, Romy Hammes, Dorothy Hammes, Kathlyn Hammes Mowbray, Bishop Robert J. Dwyer of Reno-Las Vegas, and Father John F. Brown, Provincial Superior of the Clerics of St. Viator, became a reality. On September 7, 1954, Bishop Gorman High School opened its door as the only Catholic high school in Southern Nevada. BGHS has been providing the only Catholic college preparatory education to Las Vegas students for 63 years on the Project property it now leases from the Debtor for its educational operations. BGHS has a student population of approximately 1,500 students (with a waiting list) who come to the school from 59 different middle schools in the Las Vegas valley. Thirty percent of the students come to BGHS from public schools. The school is tuition based; however, to ensure BGHS provides a Catholic college preparatory education to as many students as possible, BGHS gave $1.3 million in tuition assistance to 30

[1] This replaced an earlier lease dated February 9, 2006.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE\44565139.v7-4/17/17

1   percent of its students last year.    Moreover, some students receive scholarship funds under

2   Assembly Bill 165, the Nevada Educational Choice Scholarship, which allows families within a

3   certain income bracket to receive grants from state-approved Scholarship Organizations.

4       8.    BGHS is known for many of its high-quality programs, including athletics; however,

5   the School is proudest of its established, strong, and rigorous academic program.    Last year, 96

6   percent of the graduating seniors were accepted at 206 four-year colleges and universities around

7   the country and received $17 million in scholarship offers.

8       9.    BGHS also prides itself on ensuring its students understand the importance of service

9   to others and that community service should be celebrated.    Each year, the student body averages

10  700 hours per week in community service to approximately 150 agencies and organizations in Las

11  Vegas.    Additionally, last year BGHS's students contributed over $58,000 to assist those less

12  fortunate in the community.

13      10.    As I declared above, Debtor is a nonprofit corporation that was created for the

14  purpose of constructing and owning the Project.    In the early 2000's, a group of individuals

15  comprised of major donors and supporters of BGHS came together to start the process of planning

16  and fundraising for the construction of a new campus for BGHS that would ultimately become the

17  Project.    Tito Tiberti, then President of a family-owned construction company, the J.A. Tiberti

18  Construction Co., Inc. ("JATCO"), was among those major donors, and he was also a member of

19  BGDC's Board of Directors.

20      11.    As part of the process of planning for the construction of the Project, Tito Tiberti

21  proposed having JATCO serve as the Project's general contractor.    Debtor and JATCO ultimately

22  entered into a construction agreement, which include a related addendum, for the Project's

23  construction. Tito Tiberti, in his capacity as JATCO's president, signed the construction agreement

24  for JATCO.    From the time the construction agreement was signed between Debtor and JATCO

25  until the end of Tito Tiberti's tenure with JATCO in late 2009, Tito Tiberti controlled, and spoke on

26  behalf of, JATCO for all intents and purposes.

27      12.    Tito Tiberti was also directly involved in the oversight and direction of the Project's

28  construction, making and approving changes requested by JATCO and its subcontractors on behalf

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE\44565139.v7-4/17/17

of both JATCO and Debtor. Despite knowing of the limited resources available to Debtor to pay for construction, JATCO, through its president Tito Tiberti, did not engage in any "value engineering" on the Project. Instead, JATCO often made unilateral decisions regarding the scope of the Project and otherwise took direction directly from certain major donors who indicated they would assist in paying for the Project's construction costs upon its completion. Debtor relied upon the terms of the construction agreement and the related addendum thereto, as well as JATCO's experience in these types of construction projects, in permitting construction to proceed as JATCO directed.

13.    JATCO knew the BGDC/Debtor could only pay construction costs in the amount of those funds borrowed, and those funds donated. Indeed, JATCO knew all too well the limitations under which it was working as JATCO took it upon itself to conduct bookkeeping for the Debtor, closely monitoring all fundraising, both immediate contributions as well as contributions made over time. JATCO continued this bookkeeping service (for which the Debtor paid a monthly fee[2]), so JATCO could track donations against the cost of construction; so JATCO would know 'how far out ahead of their skis' they were getting and would know how much it would have to collect at the end of construction.

14.    JATCO called this the 'shortfall analysis.'[3]    JATCO's Director of Finance during construction, Glennon King, recalled creating detailed shortfall analyses "regularly" and providing that information directly to Tito Tiberti. (Ex 2, Arb. Tr., Vol. II, G. King, 263:1-19, 264:14-15.) These shortfall analyses kept Tito Tiberti apprised of "how much we were getting out ahead of our skis" because he wanted to "understand how much money we had to put" towards the project and whether he needed to "have a conversation with people" regarding costs of construction as the shortfall grew. (Ex. 2, Arb. Tr., Vol. III, T. Tiberti, 369:25-370:6.); Meaning, how much money

---

[2] BGDC was notified by JATCO in January 2017 that they no longer want to do the bookkeeping for BGDC. JATCO further stated that BGDC is welcome to use the services of JATCO's bookkeeper to work for BGDC as a consultant

[3] JATCO knew that its plans for the school would be its legacy and knew it would cost more than the BGDC/Debtor could afford – which is why JATCO entitled the analysis, the 'shortfall analysis.'

5

ACTIVE\44565139.v7-4/17/17

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

JATCO would have to go back to major donors for and how much it would have to cover for its desired construction amenities. A true and correct copy of the relevant excerpts from the Arbitration Transcripts are attached hereto as **Exhibit 2**.

15.    JATCO disputes these claims.  However, JATCO cannot dispute the fact that it went eighteen (18) months without submitting Pay Applications. JATCO failed to keep the BGDC/Debtor apprised of the extent of the debt.  Despite repeated requests, JATCO continually failed to provide the documentation needed to ascertain the true cost of the Project.

16.    In hindsight, it seems the Project became an obsession for Tito Tiberti and what he envisioned as his legacy; Tito Tiberti became a "perfectionist" determined on building a school with the Tiberti name on it that "everyone would be proud of." (Arb. Tr., Vol. II, G. King, 299:13-300:2.)   Notably, conference rooms and other structures owned by the BGDC continue to prominently bear the Tiberti name.

17.    Costs started escalating.  Estimates for the Project began to change significantly.

18.    Tito Tiberti began to approve and/or sign Change Orders on both sides - for both JATCO and the Debtor/BGDC.  During the construction of the Project, JATCO failed to provide timely Pay Applications the Debtor/BGDC for review, approval and processing.  The final Pay Application did not balance or reflect an accurate accounting of costs and expenses as were shown on prior Pay Applications.  For example, JATCO made an eight million dollar adjustment on its final Pay Application submitted to BGDC long after the completion of construction as its cost estimates throughout the construction of Project were incorrect.  During the construction of the Project and after its completion, JATCO never filed any type of mechanics liens against the property.

19.    In his arbitration testimony, Tito Tiberti confirmed, that after financing efforts were exhausted, donations were "the only source" of repayment contemplated by the parties.[4] (Ex. 2,

---

[4] It is important to note that the Debtor/BGDC lost approximately $2,000,000 in financing due to delays in obtaining standard information from JATCO.  The former lender, Allied Irish Bank, who was closing down the lending facility in its entirety, cut-off funding prior to JATCO submitting certain Pay Applications that could have been funded by such financing, but for JATCO's failure to timely provide such information to BGDC.

6

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Arb. Tr., Vol. III, T. Tiberti, 353:3.)  Also consistent with this understanding, Tito Tiberti and his team went to painstaking efforts to track pledges from donors, contributions received, and the magnitude of the potential shortfall looming at the completion of construction.

> Q.    Okay.  So you're tracking the number to see – I like your analogy
>
> – how far out on your skis you're getting; right?
>
> A.    Yes.
>
> Q.    And then at some point you're going to go to where to get the money, the donors?
>
> A.    *Yes*.
>
> (Ex. 2 Arb. Tr. Vol. III, Tito, 370:7-13.)

20.    The total cost of the construction performed by JATCO at the completion of the Project amounted to approximately $76 million.  Debtor made payments to JATCO during the construction and thereafter in the total amount of approximately $54 million, leaving a balance of roughly $22 million that was advanced by JATCO to Debtor related to the construction that remains outstanding today.    Consistent with the parties' understanding of the payment obligations contemplated by the construction agreement and its related addendum, JATCO took no steps to assert lien rights against Debtor either during the construction, or after completion, of the Project.

21.    Ultimately, with the parties unable to identify any possible source of available funds to make further payments to JATCO, JATCO demanded immediate payment in full and served a letter demanding arbitration. Debtor disputed that the issues raised by JATCO's demand were ripe as any payment obligation only arose under the construction agreement and related addendum when funds were available, of which there were none.  On December 4, 2015, JATCO filed a Complaint in the Eighth Judicial District Court seeking a judicial declaration compelling arbitration and appointing an arbitrator.  On January 22, 2016, the Nevada state court entered an order directing the parties to proceed with arbitration.   Thereafter, the parties conducted an arbitration regarding their dispute in June and July of 2016.

22.    On November 11, 2016, the Arbitrator issued a Final Award (the "Award") finding in favor of JATCO. The Arbitrator awarded JATCO $20,009,787.84 in damages; reflecting a

7

ACTIVE\44565139.v7-4/17/17

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

$2,000,000 setoff of the amount claimed due to JATCO's conduct. The Arbitrator also awarded interest in the amount of $8,356,100.57. Finally, the Arbitrator also awarded JATCO attorneys' fees in the amount of $353,064.77 and costs in the amount of $21,711.16. The Eighth Judicial District Court confirmed the Award and directed that judgment be entered in the total amount of $28,749,663.34. Judgment was entered in this amount on January 19, 2017 (the "Judgment"). JATCO recorded the Judgment with the Clark County Recorder's Office against certain Assessor Parcel Numbers.

23.    Subsequent to recording the Judgment, JATCO served Writs of Execution and Writs of Garnishment on several entities seeking to recover funds held by such parties owed to Debtor. Among the assets that JATCO has sought to take action against are funds held in trust by Debtor in bank accounts with Bank of America that were contributed by certain of BGDC's major donors for specific, restricted purposes.

### III.

### FIRST DAY MOTIONS

**A.    Emergency First Day Motion for Interim and Final Order Pursuant to 11 U.S.C. §§ 105, 361 and 362 and Fed. R. Bankr. P. 4001(b) and (d): (I) Authorizing Debtor to Use Cash Collateral and Provide Adequate Protection; (II) Granting Related Relief; and (III) Scheduling Final Hearing (the "*Cash Collateral Motion*")**

<u>Debtor's Need to Use Cash Collateral</u>

24.    Clark County, a political subdivision of the State of Nevada (the "County") and The Bank of New York Mellon Trust Company, N.A., a national banking association duly organized and existing under the laws of the United States of America, as trustee (the "Trustee"), are parties to the Indenture of Trust, dated as of December 1, 2011, between the County and the Trustee (as amended, modified and/or supplemented from time to time, the "Indenture").

25.    The County is authorized by the County Economic Development Revenue Bond Law, Nevada Revised Statutes Sections 244A.669 to 244A.763, inclusive (the "Act"), to issue bonds to finance projects located within the County to promote the social welfare of the residents of the County by enabling "corporations for public benefit" (as defined in the Act) to acquire, develop, expand and maintain facilities that provide services for those residents.

8

ACTIVE\44565139.v7-4/17/17

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

26.     Pursuant to the Act, the County previously issued "Clark County, Nevada Variable Rate Demand Economic Development Refunding Revenue Bonds (Bishop Gorman High School Project) Series 2011" in the aggregate principal amount of $25,000,000 (the "Bonds") pursuant to, and secured by, the Indenture.

27.     The proceeds of the Bonds were loaned to BGDC, pursuant to a loan agreement by and between the County and BGDC dated as of December 1, 2011 (as amended, supplemented and/or modified from time to time, the "County Loan Agreement").

28.     BGDC used the proceeds of the Bonds to, among other things, refinance Allied-Irish Bank, for construction and other costs related to the North expansion of the high school.

29.     The obligations of BGDC to the County under the County Loan Agreement are secured by a lien on certain assets of BGDC (the "County's Collateral"), which is perfected by a UCC-1 financing statement that was filed with the State of Nevada Office of the Secretary of State on December 19, 2011 as Document No. 2011034032-2 (as amended, modified and/or supplemented from time to time, the "County UCC").

30.     In order to provide credit and liquidity support for the Bonds, Bank of America issued the Irrevocable Transfer Direct Pay Letter of Credit No. 3118248 (as amended, supplemented and/or modified from time to time, the "Letter of Credit") to the Trustee for the account of BGDC. The Letter of Credit authorizes Trustee, among other things, to make one or more draws on Bank of America, up to an aggregate of Twenty-five Million Three Hundred Twenty Thousand Five Hundred Forty-eight and No/100 Dollars ($25,320,548.00) (as reduced and reinstated from time to time, the "Letter of Credit Amount"). Of the total Letter of Credit Amount, Twenty-five Million and No/100 Dollars ($25,000,000.00) would be in respect of the principal amount of the Bonds and the balance of Three Hundred Twenty Thousand Five Hundred Forty-eight and No/100 Dollars ($320,548.00) would be in respect of interest on the Bonds.

31.     In connection with issuance of the Letter of Credit and certain other financial accommodations provided by Bank of America to BGDC, BGDC, the Guarantor and Bank of America entered into that certain Letter of Credit and Reimbursement Agreement, dated as of December 1, 2011 (as amended, supplemented and/or modified from time to time, the

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

9

1  "Reimbursement Agreement").

2  32.  Pursuant to the Reimbursement Agreement, BGDC is required, among other things,

3  to reimburse Bank of America for any amounts paid by Bank of America pursuant to the terms of

4  the Letter of Credit.

5  33.  BGDC and Bank of America entered into that certain interest rate swap transaction,

6  effective as of November 28, 2011, which transaction is subject to the terms and conditions of, or

7  governed by, that certain 2002 Master Agreement, dated as of November 28, 2011, published by the

8  International Swaps and Derivatives Association, Inc. (together with the related schedules and as

9  amended, modified and/or supplemented from time to time, the "Swap Agreement").

10  34.  In order to guarantee the obligations of BGDC to Bank of America under the

11  Reimbursement Agreement and the Swap Agreement, Guarantor entered into that certain

12  Continuing and Unconditional Guaranty dated as of December 1, 2011 (as amended, modified

13  and/or supplemented from time to time, the "Guaranty").

14  35.  All obligations of BGDC to Bank of America under the Reimbursement Agreement

15  and the Swap Agreement are secured by a lien on the Gross Revenues (as defined in the

16  Reimbursement Agreement) of BGDC, which is perfected by a UCC-1 financing statement filed

17  with the State of Nevada Office of the Secretary of State on December 1, 2011, as Instrument

18  Number 2011031777-7 (as amended, modified, continued and/or supplemented from time to time,

19  the "Reimbursement UCC").

20  36.  BGDC's Lease with the Guarantor provides, among other things, that the Guarantor

21  shall pay to BGDC rent in the amount of One Million Six Hundred Thirty-five Thousand and

22  No/100 Dollars ($1,635,000.00) per year, payable in equal monthly installments except as otherwise

23  modified under the terms of the Lease.  However, any rent due under the Lease is impacted by the

24  Indenture, such that upon any acceleration of amounts due under the Indenture, the Guarantor shall

25  immediately pay to BGDC as rent under the Lease an amount of money which, together with other

26  moneys available under the Indenture, is sufficient to pay the entire principal of and interest on the

27  Bonds.  Rent due under the Lease is also adjustable under Section 5.2 of the Loan Agreement,

28  Section 10 of that certain Remarketing Agreement dated December 1, 2011, and Section 2.2 of the

10

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

Reimbursement Agreement.

37. All obligations of BGDC to Bank of America under the Reimbursement Agreement and Swap Agreement are secured by, among other things, that certain Deed of Trust, Assignment, Security Agreement and Fixture Filing, dated as of December 1, 2011 (as amended, modified and/or supplemented from time to time, the "Reimbursement Deed of Trust"), executed by BGDC, as grantor, to First American Title Company, as trustee, for the benefit of Bank of America, as beneficiary, and recorded on December 1, 2011, as Instrument No. 201112010002417 in the Office of the County Recorder, Clark County, Nevada. The Reimbursement Deed of Trust evidences a senior lien upon the Project and certain other assets of BGDC described therein.

38. BGDC and Bank of America previously entered into that certain Construction Loan Agreement dated as of December 1, 2011 (as amended, modified and/or supplemented from time to time, the "Construction Loan Agreement"), by and between BGDC and Bank of America. Pursuant to the Construction Loan Agreement, Bank of America issued a line of credit in the amount of Twelve Million Five Hundred Thousand and No/100 Dollars ($12,500,000.00) in favor of BGDC to allow BGDC to construct additional improvements to the Project (the "2011 Construction Loan").

39. All obligations of BGDC to Bank of America under the Construction Loan Agreement are secured by, among other things: (a) that certain Deed of Trust, Assignment, Security Agreement and Fixture Filing, dated as of December 1, 2011 (as amended, modified and/or supplemented from time to time, the "Construction Loan Deed of Trust"), executed by BGDC, as grantor, to First American Title Company, as trustee, for the benefit of Bank of America, and recorded on December 1, 2011, as Instrument No. 201112010002419 in the Office of the County Recorder, Clark County, Nevada, and encumbering certain real property owned by BGDC as more fully described therein; (b) a UCC-1 fixture filing, filed in the Office of the County Recorder, Clark County, Nevada, and recorded as Instrument No. 201112010002418 (the "Construction Loan Fixture Filing") evidencing a perfected lien on all fixtures of BGDC on the real property as more fully described therein; and (c) the Reimbursement UCC.

40. On January 11, 2017, BGDC, the Guarantor and Bank of America entered into that certain Forbearance Agreement (the "Forbearance Agreement"). Pursuant to the Forbearance

11

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE\44565139.v7-4/17/17

Agreement, BGDC granted Bank of America a lien in all assets of BGDC to secure repayment of all obligations of BGDC to Bank of America.    On January 13, 2017, an amendment to the Reimbursement UCC ("Reimbursement UCC 2017 Amendment") was filed with the Nevada Secretary of State as Document Number 2017001268-4, which restated the collateral description to the following: "ALL ASSETS OF DEBTOR (WHETHER NOW OWNED OR HEREAFTER ACQUIRED OR ARISING), AND ALL PROCEEDS (IN WHATEVER FORM OR NATURE) THEREOF" (together with all Debtor's assets in which Bank of America has an interest, lien, claim or encumbrance, including under the County UCC, the Bank Reimbursement UCC, the Reimbursement Deed of Trust, the Construction Loan Deed of Trust, and/or the Construction Loan Fixture Filing, the "Bank's Collateral").

41.    During the Chapter 11 Case, Debtor needs to use cash collateral (as defined in Bankruptcy Code section 363) in which Bank of America has an interest (the "Bank's Cash Collateral") under the Bank Loan Agreements (collectively, the "Loan Agreements").

42.    Debtor has an immediate and critical need to use the Bank's Cash Collateral. Debtor's ability to use the Bank's Cash Collateral is critical to its ability to continue as a going concern during the course of the Chapter 11 Case.  Debtor has entered into a Debtor-In-Possession Credit Agreement with SCC (the "DIP Lender") to provide post-petition financing (the "DIP Financing") to Debtor on the terms set forth therein.

43.    Subsequent to the Petition Date, Debtor contemplates utilizing a cash budget (as amended or modified from time to time, the "Cash Budget") to reflect its (a) budgeted cash receipts (including as a result of the receipt of proceeds from any DIP Financing advances) for the three (3) calendar months or thirteen (13) calendar weeks following the Petition Date, and (b) anticipated disbursements (including payments required under the terms of the DIP Financing) for each of the three (3) calendar months or thirteen (13) calendar weeks following the Petition Date.  The Cash Budget will provide for Debtor to use the Bank's Cash Collateral and the DIP Financing to fund the costs of administering Debtor's estate, including, without limitation: (i) adequate protection payments to Bank of America; (ii) expenses incurred for the administration of the Chapter 11 Case, including payment of compensation of professional fees and expenses; (iii) payment of any

12

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1  contractual obligations, consistent with a final, non-appealable order approving this Cash Collateral

2  Agreement that is in a form reasonably acceptable to Bank of America and not subject to any stay

3  (the "<u>Final Order</u>"); and (iv) repayment of borrowings under the DIP Financing.

4          44.    Now that Debtor has commenced its Chapter 11 Case, Debtor requires the consent of

5  Bank of America or approval of the Court to use its rental income, accounts receivable and bank

6  deposits since they are part of the Bank's Cash Collateral. Debtor does not have any other source of

7  cash to fund its operations that is not the Bank's Cash Collateral. If Debtor was unable to use the

8  Bank's Cash Collateral, Debtor would not have any ability to satisfy the expenses of its day-to-day

9  operations, much less the additional expenses of its Chapter 11 Case.

10         45.    Although Debtor negotiated the DIP Financing in order to provide additional post-

11 petition liquidity, Debtor still primarily needs to rely on the use of the Bank's Cash Collateral to

12 maintain its operations and remain current on expenses. See Initial Cash Budget. As set forth in the

13 Initial Cash Budget, Debtor projects that it will need to use more than $1,928,866.00 of the Bank's

14 Cash Collateral (exclusive of its existing cash as of the Petition Date and any DIP Financing

15 borrowings) during the first thirteen (13) weeks following the Petition Date in order to meet its

16 operating expenses and make interest-only adequate protection payments to Bank of America. The

17 Initial Cash Budget is based on Debtor's internally prepared projections of income and expenses

18 incurred and/or development expenses do not match projections, then Debtor's need to use the

19 Bank's Cash Collateral and/or borrow under the DIP Financing may differ from the amounts set

20 forth in the Initial Cash Budget. In addition, Debtor estimates that it will incur approximately

21 $724,358.85 in expenses associated with the Chapter 11 Case during this same period. Thus, Debtor

22 has an urgent and immediate need to use the Bank's Cash Collateral. With this necessity in mind,

23 Debtor negotiated the Cash Collateral Agreement with Bank of America.

24 **B.      Emergency First Day Motion for Order, Pursuant to 11 U.S.C. §§ 363, 1107 and 1108
           (i) Authorizing Continued Use of Cash Management System and (ii) Granting Related
25         Relief (the "<u>*Cash Management Motion*</u>")**

26         46.    I hereby incorporate my foregoing testimony generally and, in particular, from Part

27 III.A. above in this Part III.B. as if fully set forth herein.

28

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

13

47.    Contemporaneous with the filing of Debtor's Cash Management Motion, Debtor has also filed the Cash Collateral Motion.  Debtor maintains three bank accounts with Bank of America which it uses in the ordinary course of its business and, among other things, to facilitate payments to the County in compliance with the Loan Agreement, Letter of Credit, and Reimbursement Agreement.

<u>Debtor's Cash Management System and Bank Accounts</u>

48.    Debtor maintains a cash management system as part of the ordinary course of its business that allows it to efficiently collect, transfer, and disburse funds.  Post-petition, Debtor proposes to retain its current cash management system and its prepetition bank accounts (collectively the "Cash Management System").  Debtor proposes to maintain its existing bank accounts (collectively, the "Bank Accounts") post-petition.  The Bank Accounts are essential for Debtor's continued use of the Cash Management System.

49.    Prior to filing, Debtor's account ending in **6059** was used primarily for the purpose of paying the outstanding principal and interest due on the Construction Loan.  All construction loan donations were deposited into this account, including all amounts held in trust by the Debtor/BGDC that were contributed by certain of BGDC's major donors for specific, restricted purposes.  Any transactions related to the Construction loan occurred through this account.  An automatic withdrawal of $207,000 is scheduled to occur on the first business day of each month to pay the outstanding principal and interest on the Construction Loan.

50.    The account ending in **5127** was used for the purpose of paying the Debtor's various outstanding loans, other than the Construction Loan.  Several automatic withdrawals are scheduled to occur from this account on a monthly or quarterly basis.  For example, approximately $60,000 is withdrawn on the first business day of each month and is applied towards the outstanding balance of the swap transaction. On a quarterly basis, approximately $63,000 is withdrawn and applied towards the bond remarketing fees.

51.    Also withdrawn from this account is the monthly payment due to the Trustee for the Bond Loan, as well as the $295 as commission and wire fee for the bond payments.

14

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

52.    The account ending in **4652** was used by Debtor to run its day to day business.  It deposits the majority of its rental income and charitable contributions, other than donations received for the Construction Loan, into this account.  The Debtor also uses this account to pay its operating expenses and vendors for services rendered on a monthly basis.   Lastly, the Debtor occasionally transferred funds from this account to the account ending in **5127**, when necessary, in order to ensure there were sufficient funds in the account to pay Debtors various outstanding loans, other than the Construction Loan.

Benefits of the Cash Management System

53.    The most important benefit of maintaining Debtor's current Cash Management System is to avoid disruption of Debtor's ability to effectively and efficiently reorganize its business.  To avoid the operational and administrative delay that would necessarily result if Debtor closed its Bank Accounts that are integral to its Cash Management System and to ensure as smooth a transition into chapter 11 as possible, Debtor seeks authority to maintain its Cash Management System, including its Bank Accounts.

54.    Requiring Debtor to dismantle the Cash Management System would have a disastrous effect on Debtor's reorganization efforts, as well as far reaching consequences for the community as a whole.  Debtor has engaged in extensive negotiations with Bank of America and the Trustee, and a condition to their approval to Debtor's proposed Cash Collateral Stipulation and the Cash Collateral Motion is maintaining the Debtor's Cash Management System.  A failure to maintain the Cash Management System, and to make the proposed adequate protection payments, would be deemed a default under the Pre-Petition Bank Agreement.  This default would trigger a default under the Swap Agreement which would result in an approximate $4,000,000 cost to the Debtor's bankruptcy estate and could result in the Trustee breaking the Bonds and drawing down on the Letter of Credit.  If the Cash Collateral Motion and the Cash Management Motion are not granted, the Bonds will be in default resulting in unknown harm to the County as a whole.  Thus, it is in the best interest of the Debtor, its creditors, and the estate to maintain the Debtor's Cash Management System.

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

ACTIVE\44565139.v7-4/17/17

**C.    Emergency First Day Motion for Order, Pursuant to 11 U.S.C. § 521 and FBRP 1007, Extending the Deadline by which Debtor Must File Its Schedules, Statements, Lists, and Other Documents Required by 11 U.S.C. § 521 and FBRP 1007.**

55.    Debtor is a non-profit corporation, generally operates with little staffing, and does not have the resources necessary to enlist the aid of additional staffing to meet the current human resource demands under which Debtor is now operating, other than volunteers made available through either BGHS or the Guarantor.  Debtor has been in the process of addressing not only the litigation with JATCO, but also with preparing and presenting First Day motions on an emergency basis to this Court in order to stabilize Debtor's operations and to avoid immediate and irreparable harm to Debtor.  The status of Debtor, the Guarantor, and BGHS as Catholic institutions, combined with the arrival of Easter and associated holidays, have also presented challenges to Debtor's ability to address all of the various matters that must be addressed in connection with its bankruptcy filing, including the filing of all schedules, statements, lists, and other documents required by 11 U.S.C. § 521 and FRBP 1007.

56.    As a result, sufficient cause exists for Debtor to be granted a modest extension of thirty (30) days from the current filing deadline of May 1, 2017 to a date through and including May 31, 2017, without prejudice to Debtor's ability to request additional extensions of this deadline in the future, should Debtor's circumstances rise to the level of cause to seek such further relief.

**D.    Debtor's Motion for Final Order, Pursuant to 11 U.S.C. §§ 105, 364 and Fed. R. Bankr. P. 4001(c) and L.R. 4001(B) and (C): (I) Authorizing Debtor to Obtain Post-Petition Financing and Granting Related Relief (the "_DIP Financing Motion_")**

57.    I hereby incorporate my foregoing testimony generally, including that set forth in Part III.A. above, as if fully set forth here under Part III.D. of my declaration.

58.    Although Debtor does not seek a First Day hearing with respect to the DIP Financing Motion, Debtor shall separately seek the Court's authorization to obtain post-petition financing from SCC pursuant to the credit agreement and subordination agreement attached as exhibits to the DIP Financing Motion on a final basis and on regular notice under the Local Rules.  Debtor selected the entity to provide Debtor the requested post-petition financing of up to $800,000.00 (the "DIP Financing") due to the favorable terms offered to Debtor by SCC and SCC's willingness to extend credit under Debtor's present circumstances.  As to terms, SCC is willing to fund the loan on an

16

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

1    interest-only basis, without fees, and interest at the Bank of America prime rate.  As part of the

2    process through which Debtor ultimately identified and selected SCC to provide the DIP Financing,

3    Debtor, through its retained professionals, agents, employees, and/or volunteers contacted financial

4    institutions of varying sizes and market orientations.  The results of Debtor's efforts in this regard

5    were primarily refusals to even entertain entering into a post-petition financing arrangement, let

6    alone on terms as favorable as those offered by SCC.

7        59.    In addition to Debtor's efforts to identify and obtain DIP Financing, Debtor also

8    made efforts to collect an intercompany receivable due and owing from BGHS to Debtor in the

9    current amount of $4,859,567.42, as a potential alternative to the DIP Financing.  Although Debtor

10    and BGHS were ultimately able to enter into an acceptable repayment arrangement, the nature of

11    BGHS's budget as, essentially, a break-even budget on an annual basis did not allow BGHS's

12    repayments to provide Debtor with the kind of immediate liquidity Debtor needs to help fund

13    administration of this chapter 11 case like that made available by SCC under the DIP Financing.

14        60.    For purposes of full disclosure, SCC is a Nevada nonprofit corporation whose sole

15    member is the Diocese, which is the same as Debtor's legal structure.  Thus, SCC is an entity

16    related to Debtor.  Debtor seeks the DIP Financing to fund Debtor's administration of Debtor's

17    chapter 11 case, including, without limitation, payments of professional fees, payment of U.S.

18    Trustee fees, and payments of various other budgeted expenses.  Payments to Debtor's professionals

19    and U.S. Trustee fees facilitated by the availability of the DIP Financing will keep Debtor's case on

20    the path towards confirmation of a chapter 11 plan.

21        61.    As demonstrated by Debtor's budget included with the Cash Collateral Motion,

22    Debtor's need for liquidity is great and, absent approval of the DIP Financing, Debtor will likely not

23    be able to fund administrative expenses incurred by way of professional fees and U.S. Trustee fees

24    throughout the expected duration of this case.  In that event, Debtor would likely be unable to

25    reorganize due to administrative insolvency, and thus the value of Debtor's bankruptcy estate would

26    be adversely affected as a result to the detriment of Debtor's creditors.  By obtaining the DIP

27    Financing, Debtor expects that it will have sufficient liquidity to meet its expected expense

28    obligations in this case and proceed toward confirmation of a chapter 11 plan that will preserve and,

ACTIVE\44565139.v7-4/17/17

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

perhaps, increase the value of its bankruptcy estate for the benefit of Debtor's creditors.

62.    In Debtor's business judgment, approval of the DIP Financing Motion is necessary to avoid irreparable harm to Debtor's bankruptcy estate and to avoid any resulting injury to Debtor's creditors.

I declare, under penalty of perjury of the laws of the United States of America, that the foregoing statements are true and correct to the best of information, knowledge and belief.

Executed this 17th day of April, 2017, in Las Vegas, Nevada.

_____
Deacon Aruna Silva
Executive Director
Bishop Gorman Development Corporation

FOX ROTHSCHILD LLP
1980 Festival Plaza Drive, Suite 700
Las Vegas, Nevada 89135
(702) 262-6899
(702) 597-5503 (fax)

18

ACTIVE\44565139.v7-4/17/17

# EXHIBIT 1

## LEASE

THIS LEASE is entered into this 1st day of December, 2011 (the "Effective Date"), between Bishop Gorman Development Corporation, a Nevada nonprofit corporation (hereinafter, "Landlord"), and The Roman Catholic Bishop of Las Vegas, and His Successors, a Corporation Sole (hereinafter, "Tenant"). Landlord and Tenant are sometimes referenced herein collectively as the "Parties."

## R E C I T A L S

WHEREAS, the Parties entered into that certain lease dated February 8, 2006, relating to the real property then generally constituting the location of and for Bishop Gorman High School and included within and a part of the Premises as defined hereunder (the "Prior Lease");

WHEREAS, the Prior Lease was entered into by the Parties in anticipation of and before commencement of construction of the Bishop Gorman High School, the construction of which has since been completed;

WHEREAS, Landlord has recently acquired adjacent acreage which is included in the Premises hereunder and on which certain improvements are being constructed or will be constructed during the Term (as defined in Section 2); and

WHEREAS, the Parties desire to terminate the Prior Lease and enter into this Lease under the terms, conditions, and provisions for the reasons recited above and for other good and valuable consideration.

## W I T N E S S E T H :

In consideration of the Recitals above and of the terms, covenants and agreements herein contained, the Parties hereto hereby agree as follows:

1.    **Leased Premises.** Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord certain real property depicted on Exhibit "A", which is incorporated herein by this reference, and all buildings and improvements constructed or to be constructed on said real property (the "Premises"). As of the Effective Date, the Premises comprises the entirety of that real property commonly known as "Bishop Gorman High School", and further described as Clark County Assessor's Parcel Number 164-36-601-002 (the "BGHS Parcel"). Landlord is currently in the process of developing the real property adjacent to the Premises, as described and forth on Exhibit "B" (the "Development Parcels"). The Development Parcels are described as Clark County Assessor's Parcel Numbers 164-36-601-003 and 164-36-512-002. At such time as the construction of the Development Parcels is complete, as determined by Landlord, upon written notice to Tenant, the Development Parcels shall be incorporated and annexed into the Premises (the "Annexation"). Thereafter, Tenant shall have all leasehold possessory right, title and interest in and to the Development Parcels as if they were originally included in the Premises as of the Effective Date and the Premises shall include both the BGHS Parcel and the Development Parcels. Prior to the Annexation, Tenant shall not, pursuant to this Lease, be

1

obligated for any expenses associated with the Development Parcels. Tenant acknowledges that Landlord intends to merge the Development Parcels with and into the BGHS Parcel (the "Parcel Merger"). In the event that the Parcel Merger is completed by Landlord prior to the Annexation, for purposes of this Lease, the Premises shall remain comprised only of the BGHS Parcel until such time as the Annexation is complete. Tenant consents to the Parcel Merger and agrees that it shall cooperate with Landlord in the Parcel Merger and execute such additional documents or agreements and amend or modify this Lease as Landlord deems reasonably necessary to effectuate and complete the Parcel Merger.

2.    **Term.** Tenant is to have the Premises for a term commencing on the date December 1, 2011, (the "Commencement Date") and ending on November 30, 2061 (the "Term"). Landlord and Tenant acknowledge and agree that Landlord is subject to the Clark County, Nevada Variable Rate Demand Economic Development Refunding Revenue Bonds (Bishop Gorman High School Project) Series 2011 (the "Bonds") and provisions for payment of the Bonds and other expenses or sums related to the Bonds are provided for in the Indenture of Trust dated as of December 1, 2011 (the "Indenture") between Clark County, Nevada (the "County") and The Bank of New York Mellon Trust Company, N.A., as trustee (the "Trustee") and in the Loan Agreement dated as of December 1, 2011 (the "Loan Agreement") between County and Landlord.

3.    **Rent.** In consideration of the leasing of the Premises, Tenant does hereby covenant and agree to perform all of its obligations contained in this Lease and to pay Landlord rental in the sum of One Million Six Hundred Thirty-Five Thousand Dollars ($1,635,000) per year payable in equal monthly installments of One Hundred Thirty-Six Thousand Two Hundred Fifty Dollars ($136,250) ("Monthly Installment"), subject to adjustment as provided in the next paragraph of this Section. Tenant shall pay Landlord a security deposit of Two Hundred Seventy-Two Thousand Four Hundred Dollars ($272,400) payable in equal monthly installments of Eleven Thousand Three Hundred Fifty Dollars ($11,350) beginning on the same date as the rental payment. Said rental shall be payable in advance, commencing on the Commencement Date and thereafter on a monthly basis on the first day of each month.

During each month of this Lease or such other period as determined by Landlord, Landlord may adjust any and each Monthly Installment (and thereby adjust the total annual rental sum for the respective year) to equal payments due pursuant to Section 5.2 of that certain Loan Agreement dated December 1, 2011; Section 10 of that certain Remarketing Agreement dated December 1, 2011; and Section 2.2 of that certain Letter of Credit and Reimbursement Agreement dated December 1, 2011.

Upon any acceleration of amounts due under the Indenture, Tenant shall immediately pay to Landlord as rental hereunder an amount of money which, together with other moneys available therefor under the Indenture, is sufficient to pay the entire principal of and interest on the Bonds. On or before the Business Day preceding any redemption date for the Bonds (other than a mandatory sinking fund redemption date) for which a notice of redemption has been given pursuant to the Indenture, Tenant shall pay to Landlord as rental hereunder an amount of money which, together with other moneys available therefore under the Indenture, is sufficient to pay the principal of, premium, if any, and interest on the Bonds called for redemption. If on any

2

principal payment date or interest payment date for the Bonds or any other date any amounts are payable on the Bonds, the amount held by the Trustee in the Bond Principal Fund and the Bond Interest Fund under the Indenture is insufficient to make the required payments of the principal of, premium, if any, and interest on the Bonds, Tenant shall forthwith pay such deficiency as rental hereunder.

In addition, Tenant covenants and agrees to pay to Landlord as rental hereunder all amounts required to be paid by Landlord pursuant to Sections 8.5 and 10.4 of the Loan Agreement promptly upon receipt of written notice from Landlord that any such amounts are required to be paid by Landlord.

4.     **Net Lease.** It is the understanding and agreement of the Parties hereto that this is a clear "net" lease obligation, Tenant to bear all expenses and make all payments consistent with the principle of the "net" lease; and Tenant hereby assumes and agrees to perform all duties and obligations with relation to the Premises, the improvements thereon, and the appurtenances thereto, as well as the use, operation, and maintenance thereof, even though such duties and obligations would otherwise be construed to be those of Landlord.

5.     **Payment of Real Estate Taxes and Assessments.** The Parties hereto agree that, as part of the consideration for the Lease and in addition to the rent hereinbefore provided, Tenant shall during the term of this Lease and any renewal or extension thereof, pay to the public officers charged with the collection thereof, promptly as the same become due, (i) all amounts required to be paid pursuant to clauses (i) and (iii) of the first sentence of Section 6.2 of the Loan Agreement and (ii) all other taxes, levies, licenses, excises, franchises, imposts, penalties, and charges, general and special, ordinary and extraordinary, of whatever name, nature and kind, which are now or may hereafter be levied, assessed, charged, or imposed, which are or may become a lien (whether federal, state, city, county, or other public authority) upon this Lease, the Premises, the use or occupancy thereof, the buildings and improvements now or hereafter situated thereon, or upon the occupants in respect thereof.

In the event Tenant should fail to pay the taxes, governmental charges or assessments herein required to be paid by Tenant, prior to the date when a delinquent rate would be imposed, then Landlord may, at its option, pay such taxes, governmental charges or assessments to the public officers charged with the collection thereof, and the amount or amounts of money so paid by Landlord, together with interest on all such amounts at the rate of 10 percent per annum, shall be repaid by Tenant to Landlord upon demand, and the payment thereof may be collected or enforced by Landlord in the same manner as though said amounts were an installment of rent specifically required by the terms of the Lease to be paid by Tenant to Landlord upon the date when Landlord demands repayment thereof; the election of Landlord to pay such taxes, governmental charges or assessments shall not waive the default thus committed by Tenant.

If Tenant shall, in good faith, desire to contest the validity of such taxes, or other charges covered by this Section, it shall have the right to do so, provided: (1) Tenant shall promptly notify Landlord of its intention to institute such legal proceedings as are appropriate, which proceedings shall be promptly instituted and conducted in good faith and with due diligence; (2) such proceedings shall suspend the collection of such taxes or other charges from Landlord,

3

Tenant, and the Premises; (3) neither the Premises nor any part thereof nor interest therein shall be in danger of being sold, forfeited, terminated, cancelled, or lost; and (4) Tenant shall, if taxes or other charges become delinquent thereby, deposit with Landlord or the appropriate governmental authority such security for payment of the contested tax or other charge with interest and penalties as Landlord or the governmental authority shall reasonably require. Upon the conclusion of such contest of the validity of taxes or other charges by Tenant, Landlord shall return to Tenant the sum hereinabove required to be deposited by Tenant with Landlord during the period of such contest by Tenant, provided, however, that Tenant shall, prior to being entitled to a return of such monies, exhibit evidence of the payment of such contested taxes or other charges.

6.      **Other Taxes.** Tenant agrees that during the Term or any extension or renewal thereof, it will pay to the public officers charged with the collection thereof any use tax or sales tax that might be imposed by any governmental body against either Landlord or Tenant by reason of the occupancy of the Premises and payment of rental therefore by Tenant; and Tenant further covenants and agrees to pay such tax or taxes prior to the same becoming delinquent and to furnish unto Landlord evidence of such payment. In the event Tenant shall fail to pay such use or sales taxes, then Landlord, at its sole option, may pay said tax or taxes, and the amount so paid by Landlord shall be added to and become additional rental to be paid by Tenant to Landlord. Tenant shall have the option of paying any such use or sales tax directly to the governmental body assessing the same or to Landlord. In the event the same are paid to Landlord, it shall be Landlord's obligation to pay the same to such governmental body.

7.      **Insurance.** At its cost, Tenant agrees to obtain, concurrent with the taking of occupancy of the Premises, and to maintain at all times thereafter during the Term, with insurance companies qualified to do business in the State of Nevada and having fire and extended coverage insurance upon the Premises in the amount equal to the replacement cost of the improvements thereon, excluding, however, cost of foundation, underground pipes, wiring, and outside paving. Such policy or policies of insurance shall have endorsed thereon "Inflation Guard Endorsement" to cover cost-of-living increases so that the insurance coverage herein required shall be automatically increased as the cost of living increases. In lieu of such "Inflation Guard Endorsement," Tenant shall automatically increase the amount of coverage annually to cover the replacement cost of the improvements (less the cost of foundation, underground pipes, wiring, and outside paving), as the cost of such cost of living increases. Such policy or policies of insurance shall be so drawn and shall contain such provisions as will protect both Landlord and Tenant as their respective interests appear. All polices of insurance or certificates thereof as provided for in this Section and Section 8 shall be delivered to Landlord and shall be renewed from time to time by Tenant so that at all times the insurance protection herein provided shall continuously exist, and evidence of each renewal shall be submitted to Landlord at least 15 days prior to the expiration date of each policy. Tenant may maintain the insurance coverage through Tenant's blanket policy or policies and in such event, Tenant shall deliver to Landlord certificates of insurance and Tenant shall retain the original policies thereof.

If the Premises are destroyed or damaged by fire or other casualty, Tenant will promptly repair, rebuild, or restore the property damaged or destroyed to substantially the same condition as it existed prior to such damage or destruction, with such changes, alterations, and

4

modifications as may be desired by Tenant and as will not impair the character of the portion of the Premises financed or refinanced by the Bonds as a "Project" within the meaning of the Act (as defined in the Indenture) or adversely affect the exclusion from gross income of interest on the Bonds for Federal income tax purposes, which improvements shall be deemed a part of the Premises.

All net proceeds from any insurance payment received with respect to the Premises shall be used to repair, rebuild, or restore the Premises. Any balance of such net proceeds allocable to the portion of the Premises financed by the Bonds (more particularly defined in Exhibit "C" of the Loan Agreement as "School") remaining after payment of all costs of such repair, rebuilding, or restoration, if any, shall be used to redeem Bonds or to reimburse Bank (as defined in the Indenture) for drawings under the Letter of Credit (as defined in the Indenture) used to redeem Bonds.

In the event that there shall remain any portion of the proceeds of such insurance policy or policies after the repair and reconstruction of any building or improvements, not financed by the Bonds to a condition equal to the former condition thereof, and provided no condition of default exists on the part of Tenant under the terms of this Lease, then any such excess shall be paid to Tenant. Tenant shall be entitled to all insurance proceeds representing the value of the leasehold improvements being paid for by Tenant (together with all replacements thereof and additions thereto).

Tenant covenants and agrees with Landlord that Tenant will pay the premiums for all of the insurance policies that Tenant is obligated to carry under the terms of this Section and Section 8, that Tenant will deliver to Landlord evidence of such payment before the payment of any such premiums becomes in default; and Tenant will cause renewals of expiring policies to be written and the policies or copies thereof, as Landlord may require, to be delivered to Landlord at least 15 days before the expiration date of such expiring policies. If obtainable, such policy or policies of insurance shall provide that the same may not be cancelled without the giving of at least 15 days notice to Landlord of intent to cancel.

8.    **Public Liability Insurance.** Tenant covenants and agrees with Landlord that during the entire Term Tenant will indemnify and save harmless Landlord against any and all claims, debts, demands, or obligations that may be made against Landlord or against Landlord's title in the Premises arising by reason of any negligent acts or omissions of Tenant, its officers, agents, or employees in occupying the Premises; and, except as herein otherwise specifically provided, not any acts or omissions of Landlord, its officers, agents, or employees; and if it becomes necessary for Landlord to defend any action seeking to impose any such liability, Tenant will pay to Landlord all costs of court and reasonable attorney fees incurred by Landlord in such defense, in addition to any other sums that said Landlord may be called upon to pay by reason of the entry of a judgment or decree against Landlord in the litigation in which such claim is asserted. To this end, Tenant further contracts and agrees to procure and carry at its own expense insurance against all such liability in a sum no less than Five Hundred Thousand Dollars ($500,000) per occurrence. Tenant shall cause said insurance policy or policies to specifically name Landlord as an insured and furnish Landlord with a certificate of said policy or policies. Tenant shall not do or permit any act or thing that shall render such policy invalid or that shall

5

affect the validity thereof. If Tenant fails or neglects to carry such insurance as herein provided and to pay all insurance premiums therefor, or if said policy of insurance shall be cancelled for any cause whatsoever, and Tenant does not promptly obtain other insurance prior to or simultaneously with such cancellation, Landlord may effect such insurance in its own name to the extent herein provided and pay the premium therefor, and any sums paid by Landlord for said premiums shall be deemed additional rent hereby reserved and shall be payable by Tenant on demand of Landlord, together with interest at the rate of 10 percent per annum.

In addition to the insurance herein required to be furnished by Tenant, Tenant agrees that it will secure such insurance as may be necessary to provide protection and coverage against the happening of a catastrophe in an amount of at least Ten Million Dollars ($10,000,000). Such insurance may be in the form of an "umbrella" policy, it being the intent hereof that the interest of Landlord and Tenant shall be protected against the happening of a catastrophe wherein the damages sustained exceed the amount of insurance coverage provided for in Section 7 and in this Section. Landlord and Tenant each waive any claim against the other for any damage to property covered by insurance. Each party agrees to obtain a waiver of subrogation from its insurance carrier permitting this waiver.

9. **Utility Charges.** Tenant agrees and covenants to pay all utility charges, including, but not limited to, water, gas, electricity, sewage, and removal of waste materials used on or arising from use of the Premises and to pay the same monthly or as they shall become due.

10. **Fixtures and Personal Property.** It is agreed between the Parties hereto that Tenant may install any trade fixtures, equipment, and other personal property on the Premises of a temporary or permanent nature, and Landlord agrees that Tenant shall retain title to that personal property and have the right at any time, to remove any and all such trade fixtures, equipment, and other personal property that it may have stored or installed in the Premises; provided further, however, that in such event Tenant shall restore the Premises substantially to the same condition, except for ordinary wear and tear, in which they were at the time Tenant took possession. Tenant shall not be obligated to restore the Premises substantially to the same condition in which they were at the time Tenant took possession in the event of changes and alterations made upon the written approval of Landlord or in the event the Premises are surrendered because of default on the part of Landlord.

The provisions hereof shall not be construed to prevent Tenant from financing or refinancing the purchase of equipment or machinery, and Landlord shall execute such reasonable documents in favor of any financial institution holding security thereon, subordinating rights of Landlord thereof; nor shall there be a lien on any work in process of Tenant.

11. **Tenant Forbidden to Encumber Landlord's Interest.** It is expressly agreed and understood between the parties hereto that nothing in this Lease contained shall ever be construed as empowering Tenant to encumber or cause to be encumbered the title or interest of Landlord in the Premises in any manner whatsoever. In the event that, regardless of this prohibition, any person furnishing or claiming to have furnished labor or materials at the request of Tenant or of any person claiming by, through, or under Tenant shall file a lien against Landlord's interest therein, Tenant, within 30 days after being notified thereof, shall cause said

6

lien to be satisfied of record or the Premises released therefrom by posting of a bond or other security as prescribed by law, or shall cause same to be discharged as a lien against Landlord's interest in the Premises by an order of a court having jurisdiction to discharge such lien.

12.    **Lawful Use of Premises.** Tenant further covenants and agrees that said Premises and all buildings and improvements thereon during the Term shall be used only and exclusively for the use of a college preparatory coeducational high school, excepting only incidental use by affiliates of Tenant; and that said Tenant shall not knowingly use or suffer anyone to use said Premises or building for any purpose in violation of this stated purpose, the laws of the United States, the State of Nevada, the County of Clark, or any other governmental unit wherein the Premises may be located for so long as the Bonds are outstanding, for any purpose inconsistent with the definition of "Project" in the Act or that would adversely affect the exclusion from gross income of interest on the Bonds for Federal income tax purposes.

13.    **Compliance With Regulations of Public Bodies.** Tenant covenants and agrees that it will, at its own cost, make such improvements on the Premises and perform such acts and do such things as may be lawfully required by any public body having jurisdiction over said property in order to comply with such sanitary, zoning, setback, and other similar requirements designed to protect the public, applicable only to the manner of Tenant's use and occupancy of the Premises. Tenant also agrees to comply with all deed restrictions.

14.    **Signs.** During the Term, Tenant may install such signs on the Premises as may be reasonable, provided, however, that such signs shall be first approved by Landlord, which approval shall not be unreasonably withheld. Such signs may be attached to said building in such manner as may be necessary, provided that upon the termination of this Lease or any renewal or extension thereof, the same shall be removed by Tenant and that such part of the property at which said sign may have been attached shall be restored, at the expense of Tenant, to the same condition as prior to the placing of said sign.

15.    **Default by Landlord or Tenant.** In the event that either Landlord or Tenant shall violate or default under any of the terms or provisions of this Lease, each shall, as the case may be, indemnify and pay to the prevailing party all costs and expenses, including, but not limited to, reasonable attorney fees incurred in any court action including attorney fees that may be incurred on appeal, which the prevailing party may incur or pay by reason of the other party's default or Lease violation.

16.    **Landlord's Right to Inspect Premises.** Tenant agrees and covenants that Landlord or its agents, for the purposes of examining or inspecting the condition of the Premises, shall have access to the said Premises, upon the giving of 10 days' notice by Landlord to Tenant of Landlord's intent to examine or inspect the Premises. Notwithstanding the foregoing, Landlord, in the event of any emergency such as, but not limited to, a fire, flood, or severe windstorm, shall have free access to said Premises for the purposes of examining or inspecting damage done to the Premises. Landlord shall have the right to show the Premises during the six months prior to termination to prospective tenants, at reasonable times during normal business hours. Landlord further reserves the right to show the Premises to prospective purchasers.

2011 LEASE - BGDC AND BISHOP
2495412.5

17.  **Assignment or Subletting.** Tenant may not, without the prior written consent of Landlord, which consent may be withheld for any or no reason, assign this Lease or sublet in whole or in part the Premises. Unless otherwise provided in such written consent, Tenant shall continue to remain liable and responsible for the payment of rental due hereunder. If the Bonds are outstanding, no such assignment by Tenant shall adversely affect the validity of the Bonds under the Act or the exclusion from gross income of interest on the Bonds for Federal income tax purposes.

Landlord shall have the right to assign the Premises, and Tenant agrees to attorn to Landlord's assignee. No assignment by Landlord shall relieve Landlord of its obligations hereunder. So long as the Bonds are outstanding, any assignment by Landlord after the date hereof shall be subject to the provisions of Section 9.1 of Loan Agreement.

Landlord hereby authorizes and directs Tenant to pay over to Bank of America, N.A. (the "Bank") or to such other party as Landlord directs all rent payable hereunder upon receipt from Bank of written notice to the effect that Bank is then the holder of the Security Instrument (as defined in the Assignment of Leases and Rents of even date herewith from Landlord to Bank) and that a Default, as defined in such Assignment of Leases and Rents, exists, and to continue so to do until otherwise notified by Bank.

18.  **Repairs, Maintenance and Other Services.** Tenant, after the commencement of the Term, shall (i), so long as the Bonds are outstanding, take such actions as are necessary for Landlord to be in compliance with Section 6.1 of the Loan Agreement and (ii) if no Bonds are outstanding, at its own expense, maintain the Premises in as good condition and repair as the Premises were upon the commencement of this term, except for reasonable wear and use during the Term, or any extension thereof, structural repairs or repairs made necessary by reason of fire or other casualty, and negligent acts or omissions by Landlord or its agents or as otherwise specifically provided for in this Lease. The parties acknowledge and agree that Tenant shall provide all services covered by this Section, including but not limited to janitorial, security, and any and all services typically required in the operation of a school as envisioned herein.

19.  **Tax Covenant.** Tenant covenants for the benefit of Landlord, and the owners of the Bonds that it will not take any action or omit to take any action with respect to the Bonds, the proceeds thereof, any other funds of Tenant or any portion of the Premises if such action or omission (i) would cause the interest on the Bonds to lose its exclusion from gross income for Federal income tax purposes under Section 103 of the Code (as defined in the Indenture), or (ii) would cause interest on the Bonds to lose its exclusion from alternative minimum taxable income as defined in Section 55(b)(2) of the Code except to the extent such interest is required to be included in the adjusted current earnings adjustment applicable to corporations under Section 56 of the Code in calculating corporate alternative minimum taxable income. The foregoing covenant shall remain in full force and effect notwithstanding the payment in full or defeasance of the Bonds until the date on which all obligations of Tenant in fulfilling the above covenant under the Code have been met. Tenant further covenants, represents, and warrants that the procedures set forth in the tax compliance certificate executed by it in connection with the issuance of the Bonds implementing the above covenant shall be complied with to the extent necessary to maintain the exclusion from gross income of interest on the Bonds for Federal

8

income tax purposes or to avoid the application of any penalties under the Code (except to the extent noted above).

To the extent necessary to maintain the exclusion from gross income of interest on the Bonds for Federal income tax purposes (except to the extent noted above), the foregoing covenants shall remain in full force and effect notwithstanding final payment of the Bonds or defeasance of the Bonds pursuant to Article XI of the Indenture or any other provision of the Indenture or the Loan Agreement.

Tenant agrees that it will not use, or permit to be used, any portion of the Premises in an unrelated trade or business as defined in Section 513(a) of the Code or by any nonexempt person, in either case in such manner or to such extent as would adversely affect the exclusion from gross income of interest on the Bonds for Federal income tax purposes or adversely affect Tenant's Federal income tax status under Section 501(c)(3) of the Code.

**20.    Default by Tenant.** Each of the following shall be deemed a default by Tenant and a breach of this Lease:

a.    The taking possession of the Premises or property of Tenant upon the Premises by any governmental officer or agency pursuant to statutory authority for the dissolution, rehabilitation, reorganization, or liquidation of Tenant.

If default as described in paragraph (a) shall be involuntary on the part of Tenant, the event in question shall not be deemed a default within the meaning of this Lease in the absence of any adjudication thereof or final order thereon, and if paragraph (a) above shall be involuntary on the part of Tenant, there shall be no default within the meaning of this Lease, if such event is dismissed or vacated by Tenant within ninety (90) days from the occurrence of such event; otherwise such event shall constitute a default hereunder.

b.    A failure to pay the rent herein reserved, or additional rent, or any part thereof, when due.

c.    Failure in the performance of any other covenant or condition of this Lease on the part of Tenant to be performed, for a period of thirty (30) days after receipt of written notice from Landlord. For the purpose of this paragraph (c) no failure on the part of Tenant in the performance of work required to be performed or acts to be done or conditions to be modified shall be deemed to exist if steps shall have, in good faith, been commenced promptly by Tenant to rectify the same and shall be prosecuted to completion with diligence and continuity. If the matter in question shall involve building construction and if Tenant shall be subject to unavoidable delay, either by reason of governmental regulations restricting the availability of labor or materials, or by strikes or other labor troubles, or by reason of conditions beyond the control of Tenant, Tenant's time to perform under said subparagraph (c) of this paragraph shall be extended for a period commensurate with such delay.

d.    Whenever an "event of default" as defined in the Loan Agreement shall have occurred and is continuing and if the principal of and interest on the Bonds shall have been

9

declared due and payable, Landlord shall immediately declare the rent payable pursuant to Section 3 for the remainder of the Term for which Bonds are outstanding to be immediately due and payable, whereupon the same shall become due and payable.

In the event of any default as described above, Landlord may serve a written notice upon Tenant that Landlord elects to terminate this Lease upon a specified date not less than thirty (30) days after the date of the serving of such notice, and if the default remains uncured or the period is not extended as herein provided, this Lease shall then expire on the date so specified as if that date had been originally fixed as the expiration date of the term herein granted.

In the event this Lease is terminated as hereinbefore provided, or by summary proceedings or otherwise, or in the event the Premises or any part thereof shall be abandoned by Tenant, Landlord, or its agents, servants, or representatives, may immediately or at any time thereafter, reenter and resume possession of said Premises or such part thereof, and remove all persons and property therefrom, either by summary dispossession proceedings or by a suitable action or proceedings at law, without being liable for any damage therefor. Moving out of the Premises or leaving the Premises vacant shall not be deemed an abandonment of the Premises, provided that Tenant continues to pay the rent as and when due. No reentry by Landlord shall be deemed an acceptance of a surrender of this Lease.

21.    **Subordination.** This Lease, its terms, conditions, and all leasehold interests and rights hereunder, are expressly made, given, and granted subject and subordinate to the lien of any bona fide first mortgage and/or deed of trust that Landlord may secure from any bank, life insurance company, savings and loan association, or other recognized lending institution; and Tenant agrees to execute any instrument or instruments required by the mortgagee to subordinate the terms of this Lease to any such first mortgage that may be placed upon the Premises by Landlord; provided, however, that:

a.    Said mortgagee enters into a non-disturbance agreement with Tenant obligating any party acquiring title or right of possession under or by virtue of such mortgage to be bound by this Lease and by all of Tenant's rights hereunder, provided that Tenant is not then in continued default after such notice in the payment of rent or otherwise under the terms of this Lease as hereafter modified.

b.    Except as contemplated by the Reimbursement Agreement (as defined in the Indenture) Tenant is not required to become responsible or liable for the payment of any sum or sums secured by such first mortgage, and further provided that such first mortgage contains provisions, or that the mortgagee will agree by separate instrument, to notify Tenant of any default on the part of Landlord in payment or default under any other terms and conditions of the mortgage. If no Bonds are outstanding, should Tenant elect to exercise its right to take payment to a mortgagee in order to cure a default on the part of Landlord-Mortgagor, Tenant may deduct any sums so paid to cure such a default from the next ensuing payment or payments or rental as is in this Lease provided.

2011 LEASE - BGUC AND BISHOP
2495412.5

c.    Tenant agrees to notify mortgagee of any default on the part of Landlord under any of the terms and conditions of this Lease, said notice being only for the purpose of informing mortgagee of Landlord's default. Said notice shall not be construed as placing any obligations on mortgagor beyond those obligations specified in the mortgage between mortgagee and Landlord hereunder. Tenant's obligation to notify a mortgagee shall only extend to those mortgagees for whom Tenant has received from Landlord a copy of the mortgage and notice of mortgagee's address.

22.    **Condemnation.** If title to or temporary use of any part of the Premises is taken under the exercise of the power of eminent domain by any governmental body or by any person acting under governmental authority, Tenant will restore the Premises by the acquisition of other improvements suitable for Tenant's operations, which improvements shall be deemed a part of the Premises.

Tenant shall use all net proceeds from any condemnation award received with respect to the Premises to repair, rebuild or restore the Premises. Any balance of such net proceeds remaining after payment of all costs of such repair, rebuilding, or restoration shall be used to redeem Bonds (or to reimburse Bank for drawings under the Letter of Credit used to redeem Bonds) or if no Bonds are outstanding and no amounts are owed to Bank, shall be paid to Landlord.

23.    **Notices.** All notices required by the law and this Lease to be given by one party to the other shall be in writing, and the same shall be served by certified mail, return receipt requested, in postage prepaid envelopes addressed to the following addresses or such other addresses as may be by one part to the other designated in writing:

AS TO LANDLORD:                Bishop Gorman Development Corporation
                               336 Cathedral Way
                               Las Vegas, NV 89114-1316
                               ATTN: Br. John J. Dodd, C.S.V.

AS TO TENANT:                  The Roman Catholic Bishop of Las Vegas and
                                   His Successors, a Corporation Sole
                               Attn: The Most Reverend Bishop Joseph A. Pepe
                               336 Cathedral Way
                               Las Vegas, NV 89114-1316

With a copy of all notices to either
Landlord or Tenant to (which shall
not constitute notice):

                               The Roman Catholic Bishop of Las Vegas
                               P.O. Box 18316
                               Chancery Office
                               Las Vegas, Nevada 89114-8316
                               Attention: Judith Simon-Kohl

11

Telephone:  (702) 735-4570
Telecopier:  (702) 369-5922

Bishop Gorman High School
5959 S. Hualapai Way
Las Vegas, Nevada 89148
Attention:  John Kilduff
Telephone:  (702) 476-4039
Telecopier:  (702) 732-8830

Lewis and Roca LLP
3993 Howard Hughes Parkway
Suite 600
Las Vegas, NV 89169
ATTN: Scott MacTaggart, Esq.
Telephone:  (702) 474-2646
Telecopier:  (702) 216-6180

24.    **Waiver of Default.** The waiver by either party of any default under this Lease shall not constitute (a) a continuing waiver, (b) a waiver of any subsequent default of the same provision, or (c) a waiver of a default of a different provision of this Lease.

25.    **Savings and Severability Clause.** The parties hereby acknowledge that (a) Landlord is subject to certain restrictions as to use of the property relating to the original land purchase agreement, including attachments thereto, with the Howard Hughes Corporation ("Hughes Agreement"); and (b) Landlord and Tenant have both been determined by the Internal Revenue Service to be 501(c)(3) corporations ("IRS Determinations"). Accordingly, the parties hereby agree that, should any provision of this Lease, other than those contained in Section 3, either violate, cause a default, or would cause other adverse actions, in either the Hughes Agreement or in regards to any of the IRS Determinations, then such provision of this Lease shall be deemed hereby to be modified, amended, or removed, as the case may be, so as to ensure that full compliance with both the Hughes Agreement and the IRS Determinations is maintained, as well as this Lease remaining in full force and effect. If any other provision of this Lease is deemed to be invalid or ineffective by a court of competent jurisdiction, then said provision shall be deemed removed or modified, as applicable, and this Lease shall remain in full force and effect.

26.    **Time of Essence/Force Majeure.** Time is of the essence in all matters of performance by Landlord and Tenant hereunder. Whenever a period of time is herein prescribed for action to be taken by Landlord or Tenant hereunder, Landlord or Tenant shall not be liable or responsible for, and there shall be excluded from the computation for any period of time, any delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations, or restrictions or any other cause of any kind whatsoever which are beyond the control of Landlord or Tenant; provided that, nothing in this Section shall relieve Tenant from paying rent at the times and in the amounts required by Section 3.

12

27.    **Binding on Heirs and Assigns.** Subject to the provisions of this Lease pertaining to assignment of Tenant's interest, all provisions of this Lease shall extend to and bind, or inure to the benefit of the parties to this Lease and their respective heirs, executors, representatives, successors, and assigns of Landlord or Tenant.

28.    **Rights and Remedies.** The rights and remedies by this Lease are cumulative and the use of any one right or remedy by either party shall not preclude or waive its right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance, or otherwise.

29.    **State Law to Apply.** This Lease shall be construed under and in accordance with the laws of the State of Nevada, and venue for any action hereunder shall lie in Clark County, Nevada.

30.    **Legal Construction.** In case any one or more of the provisions contained in this Lease shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provision hereof and this Lease shall be construed as if such invalid, illegal, or unenforceable provision had never been contained herein.

31.    **Prior Agreements Superseded.** Without limiting Section 43, this Lease constitutes the sole and only agreement of Landlord and Tenant and supersedes any prior understandings or written or oral agreements between the parties respecting the subject matter of this Lease.

32.    **Amendment.** No amendment, modification, or alteration of the terms hereof shall be binding unless it is in writing, dated subsequent to the date hereof, and duly executed by the parties, and, only for the period of time the Bonds are outstanding, Bank, County, and Trustee shall each have consented in writing, which consents shall not be unreasonably withheld, to such amendment, modification, or alteration except for terms relating to payment for which the consent of Bank, County, and Trustee may be withheld in their discretion.

33.    **Attorneys' Fees.** Any signatory to this Lease who is the prevailing party in any legal proceeding against any other signatory brought under or with relation to this Lease or this transaction shall be additionally entitled to recover court costs, and reasonable and necessary attorneys' fees from the non-prevailing party.

34.    **Quiet Enjoyment.** In addition to any covenant implied by law, Landlord hereby covenants and agrees that, subject to Tenant's payment of the sums due hereunder in accordance with the terms hereof, and Tenant's compliance with all of the other terms, provisions, and covenants herein, Tenant shall be entitled to peaceful and quiet enjoyment of the Premises against any and all interference by the affirmative acts of Landlord, third parties controlled by Landlord, or its or their agents or employees acting within the course and scope of their agency or employment, and against any party claiming superior title to all or any part of the Premises by, through or under Landlord, but not otherwise. Landlord shall not be responsible to prevent

13

41.     **Contest.** Tenant shall have the right, after written notice to Landlord, to contest by appropriate legal proceedings, diligently conducted in good faith, the validity or application of any law, ordinance, order, rule or regulation, including mechanic's liens, and to delay compliance therewith pending the prosecution of such proceedings, provided no civil or criminal penalty would be incurred by Landlord and no lien or charge would be satisfied out of the Leased Premises during the pendency of such contest. Tenant will, at Tenant's expense, defend Landlord relating to a contest initiated by Tenant in which Landlord is joined by a third party.

42.     **Memorandum of Lease.** The Parties agree that a Memorandum of this Lease may be recorded in the Official Records of Clark County, Nevada.

43.     **Prior Lease.** The Parties agree that the Prior Lease is hereby cancelled and terminated upon the Commencement Date but that all rights, obligations, and covenants which are intended to survive said cancellation or termination either under the terms of said Prior Lease or otherwise under law do in fact survive and are to such extent enforceable by and against the Parties.

44.     **Landlord's Reservations.** Until such time as the Annexation occurs and during the construction of the Development Parcels, Landlord reserves unto itself:

a.     Non-exclusive easements in gross on, over or across the Premises, for the purpose of construction of the Development Parcels, including, without limitation, for the installation, emplacement and maintenance of improvements, including, structural, mechanical and electrical systems and utilities (without unreasonably interfering with Tenant's reasonable use and enjoyment of the Premises). Such access may include modification of the improvements' (on both the BGHS Parcel and the Development Parcels) structural, mechanical and electrical systems and components. Tenant acknowledges that (i) certain improvements on the BGHS Parcel and the Development Parcels may encroach on the parcel boundary lines until such time as the Parcel Merger occurs, and (ii) Landlord's construction and development activities as set forth herein and as to be completed on the BGHS Parcel and the Development Parcels are for the current and future benefit of Tenant.

b.     The right to run utility lines, pipes, conduits and ductwork through the air space above any improvements' ceiling, and through the columns and walls of the improvements on the Premises, in locations which will not materially interfere with Tenant's use of the Premises, and to maintain, repair, alter, replace or remove the same.

c.     The right at any time and from time to time to (a) make or permit changes or revisions in the site plan for the Premises and the Development Parcels including additions to, subtractions from, rearrangements of, alterations of, modifications of or supplements to the building areas, walkways, parking areas, driveways or other common areas, (b) construct other buildings or improvements in or as additions to the Premises and the Development Parcels and to make alterations thereof or additions thereto and to build additional stories on any such building or buildings and to construct other buildings or improvements adjoining the same, and (c) make or permit changes or revisions in the Premises and the Development Parcels, including additions thereto, and to convey portions of the Premises and the Development Parcels to others for the

15

purpose of constructing thereon other buildings or improvements, including additions thereto and alterations thereof.

[SIGNATURES ON FOLLOWING PAGE]

16

IN WITNESS WHEREOF, this agreement has been executed as of the Effective Date.

## LANDLORD

Bishop Gorman Development Corporation,
a Nevada corporation

By: _Rev. John J. Dobbelaar_

Name: _Fr. John J. Dobb.c.s.v_

Its: _Executive Director_

## TENANT

The Roman Catholic Bishop of Las Vegas
and His Successors, a Corporation Sole

By: _+ Joseph A. Pepe_

Name: _Joseph A. Pepe_

Its: _Bishop of Las Vegas_

EXHIBIT "A"

BGHS PARCEL

(to originally comprise the Premises, as set forth in Section 2)

Clark County Assessor's Parcel Number 164-36-601-002

PARCEL 2 AS SHOWN BY MAP THEREOF ON FILE IN FILE 106, PAGE 8 OF PARCEL MAPS IN THE COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA, LYING WITHIN THE NORTHEAST QUARTER (NE ¼) OF SECTION 36, TOWNSHIP 21 SOUTH, RANGE 59 EAST, M.D.M., CLARK COUNTY, NEVADA.

TOGETHER WITH:

A PORTION OF COMMON LOT "H" OF SUMMERLIN VILLAGE 16 SOUTH AS SHOWN BY MAP THEREOF ON FILE IN BOOK 119, PAGE 69 OF PLATS IN THE COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA, LYING WITHIN THE NORTHEAST QUARTER (NE ¼) OF SECTION 36, TOWNSHIP 21 SOUTH, RANGE 59 EAST, M.D.M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF PARCEL 2 AS SHOWN BY MAP THEREOF ON FILE IN FILE 106, PAGE 8 OF PARCEL MAPS IN THE COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA; THENCE ALONG THE SOUTH LINE OF SAID COMMON LOT "H", SOUTH 89°21'00" WEST, 8.51 FEET; THENCE DEPARTIN SAID SOUTH LINE, NORTH 03°51'31" WEST, 120.51 FEET TO THE NORTHERLY LINE OF SAID COMMON LOT "H"; THENCE ALONG SAID NORTHERLY LINE, FROM A TANGENT BEARING NORTH 48°36'36" EAST, CURVING TO THE LEFT ALONG THE ARC OF A 87.00 FOOT RADIUS CURVE, CONCAVE NORTHWESTERLY, THROUGH A CENTRAL ANGLE OF 07°27'05", AN ARC LENGTH OF 11.31 FEET TO THE WESTERLY LINE OF SAID PARCEL 2 TO WHICH A RADIAL LINE BEARS SOUTH 48°50'28" EAST; THENCE DEPARTING SAID NORTHERLY LINE AND ALONG SAID WESTERLY LINE, SOUTH 03°51'31", 128.44 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH:

A PORTION OF COMMON LOT "G" OF SUMMERLIN VILLAGE 16 SOUTH AS SHOWN BY MAP THEREOF ON FILE IN BOOK 119, PAGE 69 OF PLATS IN THE COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA, LYING WITHIN THE NORTHEAST QUARTER (NE ¼) OF SECTION 36, TOWNSHIP 21 SOUTH, RANGE 59 EAST, M.D.M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST EASTERLY CORNER OF SAID COMMON LOT "G"; THENCE ALONG THE SOUTHERLY LINE OF SAID COMMON LOT "G", FROM A TANGENT BEARING SOUTH 41°09'32" WEST, CURVING TO THE RIGHT ALONG THE ARC OF A 87.00 FOOT RADIUS CURVE, CONCAVE NORTHWESTERLY, THROUGH A CENTRAL ANGLE OF 07°27'05", AN ARC LENGTH OF 11.31 FEET TO A POINT TO

A-1

WHICH A RADIAL LINE BEARS SOUTH 41°23'24" EAST; THENCE DEPARTING SAID SOUTHERLY LINE, NORTH 03°51'31" WEST, 15.96 FEET TO THE EASTERLY LINE OF SAID COMMON LOT "G"; THENCE ALONG SAID EASTERLY LINE, SOUTH 48°50'28" EAST, 12.02 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH:

A PORTION OF COMMON LOT "F" OF SUMMERLIN VILLAGE 16 SOUTH AS SHOWN BY MAP THEREOF ON FILE IN BOOK 119, PAGE 69 OF PLATS IN THE COUNTY RECORDER'S OFFICE, CLARK COUNTY, NEVADA, LYING WITHIN THE NORTHEAST QUARTER (NE ¼) OF SECTION 36, TOWNSHIP 21 SOUTH, RANGE 59 EAST, M.D.M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST SOUTHERLY CORNER OF SAID COMMON LOT "F"; THENCE ALONG THE SOUTHERLY LINE OF SIAD COMMON LOT "F", NORTH 48°50'28" WEST, 12.02 FEET; THENCE DEPARTING SAID SOUTHERLY LINE, NORTH 03°51'31" WEST, 143.36 FEET TO THE WESTERLY LINE OF PARCEL 2 AS SHOWN BY MAP THEREOF ON FILE IN FILE 106, PAGE 8 OF PARCEL MAPS IN THE COUNTY RECORDER'S OFFICE, CLARK COUNTY, BEING A POINT OF CUSP; THENCE ALONG SAID WESTERLY LINE, FROM A TANGENT BEARING SOUTH 03°51'31" EAST, CURVING TO THE LEFT ALONG THE ARC OF A 50.00 FOOT RADIUS CURVE, CONCAVE NORTHEASTERLY, THROUGH A CENTRAL ANGLE OF 41°15'05", AN ARC LENGTH OF 36.00 FEET TO A POINT OF REVERSE CURVATURE THROUGH WHICH A RADIAL LINE BEARS SOUTH 44°53'25" WEST; THENCE ALONG SAID WESTERLY LINE, CURVING TO THE RIGHT ALONG THE ARC OF A 87.00 FOOT RADIUS CURVE, CONCAVE WESTERLY, THROUGH A CENTRAL ANGLE OF 86°16'07", AN ARC LENGTH OF 130.99 FEET TO A POINT TO WHICH A RADIAL LINE BEARS SOUTH 48°50'28" EAST, BEING THE POINT OF BEGINNING.

A-2

2011 LEASE - BGDC AND BISHOP
2495412.5

EXHIBIT "B"

DEVELOPMENT PARCELS

(to be incorporated and annexed into the Premises, as set forth in Section 2)

Clark County Assessor's Parcel Numbers 164-36-601-003 and 164-36-512-002

Parcel Number 164-36-601-003

THAT PORTION OF GOVERNMENT LOTS 10, 23, 31, 32, 37, 39, 41, 42, 43 AND PORTION OF GOVERNMENT LOT 29 LYING WITH SECTION 36, TOWNSHIP 21 SOUTH, RANGE 59 EAST, M.D.M., CLARK COUNTY, NEVADA, DESCRIBED AS FOLLOWS:  LOT 2 AS SHOWN BY MAP THEREOF IN FILE 117 OF PARCEL MAPS, PAGE 80 IN THE OFFICE OF THE COUNTY RECORDER, CLARK COUNTY, NEVADA.

Parcel Number 164-36-512-002

LOT THREE-A (3A) OF "AMENDED PLAT OF A PORTION OF SUMMERLIN VILLAGE 16 SOUTH", AS SHOWN BY MAP THEREOF ON FILE IN BOOK 142, OF PLATS, PAGE 94, IN THE OFFICE OF THE COUNTY RECORDER OF CLARK COUNTY, NEVADA.

B-1

# EXHIBIT 2

Arbitration Proceedings

Volume II, Pages 254 - 325

**Case:**

J.A. Tiberti Construction Co., Inc. v. Bishop Gorman Development Corporation
120003683

**Date:**

06/02/2016



# OASIS

## REPORTING SERVICES

400 South Seventh Street • Suite 400, Box 7 • Las Vegas, NV 89101
702-476-4500 | www.oasisreporting.com | info@oasisreporting.com

COURT REPORTING | NATIONAL SCHEDULING | VIDEOCONFERENCING | VIDEOGRAPHY

Page 262

1    ARBITRATOR PRO: Was there anybody else that
2  you're aware of that was involved in that?
3    THE WITNESS: Not to my knowledge.
4    ARBITRATOR PRO: Okay, thank you.
5  BY MR. FERRARIO:
6    Q. Mr. King, you said you had a running dialogue
7  with Tito about the project?
8    A. Right.
9    Q. And he was asking you to track certain things,
10 correct?
11   A. Correct.
12   Q. Why don't you turn to -- grab the books behind
13 you, Exhibit 113. Take a moment to familiarize yourself
14 with that exhibit.
15   A. Okay.
16   Q. Is the exhibit familiar to you?
17   A. I prepared this exhibit.
18   Q. Okay. And was this something that you
19 prepared at Tito's direction?
20   A. I prepared these at Tito's direction on many
21 occasions.
22   Q. We're not going to go through them all. This
23 is merely illustrative. They're already in evidence.
24     So what was the purpose of preparing this
25 exhibit?

Page 263

1    A. Tito Tiberti has an insatiable appetite for
2  information on any project that he was doing. And he
3  would ask me, "Where are we with the pledges? Where are
4  we with collections? Where are we with the
5  construction? You know, "Is there enough money to cover
6  it?" So these were the type of schedules I would
7  prepare to answer his questions.
8    Q. Okay. And there is a line you can see
9  probably almost to the bottom. So let's say the last
10 quarter. It says, "Phase 1 Shortfall," and there's a
11 line below it says, "Phase 2 Shortfall," and then "Total
12 Project Shortfall." Do you see that?
13   A. Yes.
14   Q. What were you referring to when you used the
15 term "shortfall"?
16   A. The shortfall was the difference between what
17 was going to be spent on the project versus what we were
18 able to collect, or what was going to be collected.
19 Source and use of funds, if you will.
20   ARBITRATOR PRO: Could you tell me what
21 date -- this doesn't bear, at least not that is apparent
22 to me, a date. What period does this cover, this
23 particular document 113?
24   THE WITNESS: I'm sorry, I don't know.
25 Unfortunately, I didn't date this one.

Page 264

1    MR. FERRARIO: Hang on.
2    MR. MILTENBERGER: We received a lot of
3  documents in electronic format and in native format, and
4  the title of these documents often had the date in them.
5  And if you look at our exhibit list, which starts at the
6  beginning, Number 113 has the date of October 7, 2005,
7  and that is a date that was taken from the electronic
8  file and versions. And we can pull those for you if
9  you'd like to see the documents we received from
10 Tiberti.
11   ARBITRATOR PRO: No, I don't need you to do
12 that for me. I just wanted to get some grasp of when
13 this document would have been generated.
14     You said you prepared them regularly.
15   THE WITNESS: Exactly.
16   MR. FERRARIO: I can go through -- we have a
17 number of them. They're all the same.
18   ARBITRATOR PRO: No, no. I don't --
19   MR. FERRARIO: They all are different versions
20 of this.
21   ARBITRATOR PRO: All right.
22   THE WITNESS: Right.
23   MR. FERRARIO: And this is from the batch that
24 we got before the last arbitration hearing was set.
25   ARBITRATOR PRO: Okay.

Page 265

1  BY MR. FERRARIO:
2    Q. And you can see the charts that you prepared,
3  okay?
4    A. Yes.
5    Q. All right. And you calculate, you know, "Cash
6  Available," like on the last page; do you see that?
7    A. I do.
8    Q. And then "Cash Expenditures," and then you
9  have "Ending Shortfall"?
10   A. Correct.
11   Q. All right. And you said you were using
12 sources and uses of funds analysis, right?
13   A. Yes.
14   Q. So what was the source of funds you were
15 tracking?
16   A. Um, Bishop Gorman Development had pledges,
17 pledges that they had collected. They were the
18 recipient of the funds from the sale of the old Bishop
19 Gorman campus. There was a little bit of interest
20 income that basically was their sources of funds.
21   Q. And throughout the course of the project, you
22 were at Tito's direction tracking donations, correct?
23   A. Correct.
24   Q. If you would turn to page or Exhibit 110, I
25 think it's in the same book. Do you recognize that

Page 298

1  going to say the majority of the board or the majority
2  of Bishop Gorman Development being there.
3       ARBITRATOR PRO:  All right.  Thank you.
4  BY MR. FERRARIO:
5       Q.  Mr. King, turning back to that note.  It says
6  "Pledges not sustaining construction for Phase 1."
7  There was also a Phase 2 and Phase 3 of this project,
8  correct?
9       A.  Correct.
10      Q.  And why did JATCO undertake to build Phases 2
11  and 3 if the pledges couldn't sustain Phase 1?
12      A.  I don't know.
13      Q.  Did you ever talk to Tito about that?
14      A.  No.  No.
15      Q.  Mr. Hejmanowski has referred a number of times
16  to how nice the school is.
17      A.  Yes.
18      Q.  And I take it you're aware of that?
19      A.  Very nice.
20      Q.  Did you ever talk to Mr. Tiberti about how the
21  school was to look, you know, why it looks so nice, I
22  guess?
23      A.  I was in many meetings with Mr. Tiberti when
24  they talked about --
25      Q.  We're talking about Tito here.

Page 299

1       A.  Yes.  When they talked about the quality of
2  the school and the son, and Tito said to me one time
3  the Catholic students in this valley had gone to the old
4  campus for several decades, and they didn't have
5  athletic field, and the locker rooms were horrible, and
6  they were overcrowded and understaffed, and it was not a
7  very nice facility, it was a dump.
8       ARBITRATOR PRO:  The graduates still did
9  pretty well.  Sorry.
10      MR. FERRARIO:  You're not a graduate, are you?
11      ARBITRATOR PRO:  No, no.  I grew up in the Bay
12  area, but no.
13      A.  And Tito is a perfectionist in everything he
14  does.  And he wanted to build a facility that the
15  Valley, everyone would be proud of, Tiberti's name would
16  be on it, and yes, that's the kind of building -- I mean
17  that's the kind of project.  That's what Bishop Gorman
18  High School is.
19  BY MR. FERRARIO:
20      Q.  You're familiar with the concept of value
21  engineering?
22      A.  Yes.
23      Q.  And in construction, can you just explain what
24  that is?
25      A.  Oh --

Page 300

1       Q.  Suffice to say this was not value engineered?
2       A.  It was not value engineered.
3       MR. FERRARIO:  Nothing further.  Thank you.
4       ARBITRATOR PRO:  Mr. Hejmanowski?
5       MR. HEJMANOWSKI:  I do have a few questions
6  now.  Sorry.
7       THE WITNESS:  That's okay.
8  RECROSS-EXAMINATION
9  BY MR. HEJMANOWSKI:
10      Q.  First, you talked about the family meetings.
11  The family meets as shareholders and directors twice a
12  year.  And at that time, as you mentioned, there are
13  reports given.  But those reports are in what we call
14  the family book?
15      A.  Correct.
16      Q.  And there would be a little page for each
17  asset that's going to be discussed, correct?
18      A.  Correct.
19      Q.  So there would be a page for each pending --
20  each building that they owned, each thing that was going
21  on, but nowhere in those family books did you ever
22  present any of the shortfall calculations, did you?
23      A.  No.  There were -- the individual asset pages
24  were for assets they owned, and they didn't own anything
25  of the high school.  They had a receivable, which is

Page 301

1  reflected in the balance sheet on the front page of the
2  family book.
3       Q.  Right.
4       A.  And that receivable would be evaluated by the
5  family members and they would decide whether to leave it
6  on the books at face value or whether it should be
7  devalued, and I believe it was written down to $16
8  million.
9       Q.  For the purposes of the family buy and sell
10  agreement?
11      A.  Correct.
12      Q.  Now, let's go to a couple of exhibits.  Let's
13  go to 164 for a moment.
14      A.  Okay.
15      Q.  We talked about the budget evolution.  You
16  mentioned it again with Mr. Ferrario.  Is this the
17  document to which you were referring?
18      A.  Mr. Molnar prepared a landscape budget
19  evolution where he showed what the original budget was
20  and the increases and, of course, if you give him a
21  schedule, I mean, most people you give them a schedule,
22  you show them the numbers jumped, they want to know why.
23  This is the why (Indicating).  When I was talking about
24  the budget evolution, I was actually talking about the
25  schedule.

Arbitration Proceedings

Volume III, Pages 326 - 418

**Case:**

J.A. Tiberti Construction Co., Inc. v. Bishop Gorman Development Corporation
120003683

**Date:**

06/10/2016



## OASIS

### REPORTING SERVICES

400 South Seventh Street • Suite 400, Box 7 • Las Vegas, NV  89101
702-476-4500 | www.oasisreporting.com | info@oasisreporting.com

COURT REPORTING | NATIONAL SCHEDULING | VIDEOCONFERENCING | VIDEOGRAPHY

Arbitration Proceedings, Volume III    J.A. Tiberti Construction Co., Inc. v. Bishop Gorman Development Corporation

Page 366

1 really, like I've said earlier, it was really a
2 combination of hoping that the banks and/or the bonds
3 could be increased, and I don't remember the
4 technicalities, if there was some room in the bonds if
5 we put up more physical structure and you put up more
6 bank money, and they were first, who was second, and
7 then the donors with X-number of dollars. So we kind of
8 worked with that formula, and -- but that was hard. At
9 the time everybody was so busy and the banks and
10 everybody, it was crazy everywhere. Like I say, you
11 couldn't get inspectors out on the job, you couldn't get
12 the guys to draw the plans. You couldn't get the bond
13 people to fly up and see you. I mean, it was just kind
14 of a crazy -- getting ready for the bubble to burst, and
15 nobody told me about that, so it was a combination of
16 mostly at that time it had to be donors because the
17 banks and them were starting to say, you know, this is
18 going to get out of tilt here. But, like I say, the
19 economy was doing well, there was a lot of enthusiasm,
20 and the campus really was morphing into -- you know, it
21 felt good the people would bring them out there, so it
22 seemed like it was the right thing to do.
23     Q. Okay. Let's go to the shortfall. We're going
24 to go to Exhibit 113. If you can pull -- it would be on
25 the extreme right.

Page 367

1     If you could look at Exhibit 113, please?
2     A. 113 is the next one?
3     Q. Yes.
4     A. Oh, I see it.
5     Q. Now, I'm only showing you this for
6 illustrative purposes. We talked about it with Glenn
7 King and there's a number of similar type documents in
8 there, so if you think you need to look at something
9 else or you need more information, feel free to ask.
10 First, I'd just like you to take a moment and look at
11 that document if you would, please. It's three pages.
12     A. (Witness examined document.)
13     MR. HEJMANOWSKI: Mr. Ferrario, do you know
14 offhand, are these three pages directly related or do
15 they just happen to be three that were stuck together?
16     MR. FERRARIO: No, these were directly related
17 and I think we covered them with Mr. King. This was
18 typical of the schedules he prepared.
19     MR. MILTENBERGER: They were contained in one
20 PDF file of the document together.
21     MR. FERRARIO: We tried to do that when you
22 gave them to us. We tried to keep everything together.
23     MR. HEJMANOWSKI: I have no question about
24 that, but as I look at the numbers, they don't seem to
25 track from page to page and that's what led to the

Page 368

1 question.
2     MR. FERRARIO: That's why we asked Glenn to
3 tell us. And we've got another one we're going to go
4 to.
5 BY MR. FERRARIO:
6     Q. Mr. Tiberti, on the information we got from
7 the company, it shows that this was prepared somewhere
8 around October of '05 to the best we could tell, and we
9 went through this with Mr. King the last time.
10     Do you recognize this document particularly?
11     A. No. We had the Springs Preserve going on and
12 a bunch of other projects, and this would be -- I mean,
13 this makes some sense in a way. I do remember taking
14 the computers out and the desk and probably forgot about
15 -- and the landscaping -- but when I see down here
16 "shortfall with bond payment," I can't quite assimilate
17 that in my mind.
18     Q. What about the charts showing kind of the
19 tracking a shortfall? Do you remember getting charts
20 like that throughout the course of the project?
21     A. I don't remember this specific thing, but, you
22 know, you get lots every day there's juggling a lot
23 of --
24     Q. Let me ask you a broader question then.
25 Mr. King testified that it was typical for him to

Page 369

1 prepare something like this and send it to you on a
2 regular basis to track the shortfall between what was
3 being spent on construction, what was coming in on
4 donations. Do you recall having him do that?
5     A. Oh, sure. Yes, he was excellent at that, and
6 you've got to have a roadmap of what you're doing or
7 where you've been and where you're going, and all these
8 numbers are piling up everywhere within the computer and
9 he could break it out where you could understand it, and
10 everybody else in the Gorman community had to see this,
11 too, and Facciolo and all those people -- - Rick
12 Facciolo, I don't know if you've ever heard that name -- so
13 yes, I looked at this all the time.
14     Q. Okay. So it's your recollection then you had
15 Mr. King tracking this shortfall, as it's been
16 described, throughout the course of the project?
17     A. Correct.
18     Q. And why were you doing that?
19     A. Why? I'm not doing this for free. I mean,
20 we've got to know what we're -- we can't build something
21 we can't get paid for.
22     Q. Right. So you wanted to know, I guess, how
23 much of a receivable you were accruing?
24     A. Well, really I didn't think it was going to be
25 a receivable. I thought it was how much we were getting

Arbitration Proceedings, Volume III    J.A. Tiberti Construction Co., Inc. v. Bishop Gorman Development Corporation

Page 370

1  out ahead of our skis -- I'm sorry, I wanted to know how
2  much we were out and ahead of our skis, is what I said,
3  before we could understand how much money we had to put
4  our foot down to get things or not do something, or have
5  a conversation with people how did they feel about it
6  and here's the numbers.
7      Q.  Okay.  So you're tracking the number to see --
8  I like your analogy -- how far out on your skis you're
9  getting; right?
10     A.  Yes.
11     Q.  And then at some point you anticipate you're
12 going to go to where to get the money, the donors?
13     A.  Yes.
14     Q.  Okay.  And did that happen?  Did you go to the
15 donors at the conclusion of the project?  And we've all
16 agreed that basically at the end of the project it was
17 like a $22 million shortfall.
18     MR. HEJMANOWSKI:  Excuse me.  Remember
19 Mr. Tiberti left the company in 2009, which was the
20 conclusion of the project, so you need to narrow in on
21 the date if you're going to ask him if he was going
22 after donors.
23 BY MR. FERRARIO:
24     Q.  You were aware of the shortfall; correct?
25     A.  Not of -- I didn't know.  These numbers

Page 371

1  weren't put together.  They were getting put together
2  because we were wrapping up the project I think at the
3  end of -- during 2008 and '9, and like I say, my brother
4  came in and was going to get out of the company, the car
5  business was disintegrating, General Motors was going
6  bankrupt, the whole thing was going off the cliff
7  simultaneously at the time, and if you had told me that
8  all these things were going to happen, I would never
9  have even believed it, but we had to finish what we were
10 there in a way, and I think Mr. Fertitta was sick, and I
11 think my partner in the car business died in June.
12     Q.  Of what year?
13     If we take '09 December as the time you
14 leave --
15     A.  Yes.
16     Q.  -- the management of the company?
17     A.  Yes, but I think -- what would seven years ago
18 from right now be?
19     ARBITRATOR PRO:  June of 2009.
20     A.  Yes, I think that Dan Tobin died in -- I was
21 getting ready to leave on a boat trip -- I missed the
22 funeral -- our annual boat trip, and Dan Tobin died in
23 early June, and then a partner and friend of mine,
24 Robert Nagy, died in July of cancer, and I was down
25 visiting him, he had a wife and no children, and then

Page 372

1  Mr. Fertitta died in August.  So it was like everything
2  was going down the cliff.
3      And then a partner in the car business, which
4  was a major thing, because he died unexpectedly, he had
5  a heart attack and died in bed that night -- he was fine
6  a week before -- and then my friend Robert Nagy who I
7  was partners with in some real estate things, he died in
8  July, and Mr. Fertitta died I think it's seven years ago
9  this August.
10     So it was like an avalanche going downhill of
11 everything.
12     Q.  Right.  I mean, the economy had crashed by
13 then?
14     A.  Yes.  I mean, they stopped a Stardust project
15 called Echelon.  Everything just seemed to be just
16 completely crumbling around me, and it was just -- you
17 could hardly swim up and keep your head above water.
18     So my answer to your question is, I don't
19 think I ever saw in my mind it was 22 million.  I
20 thought it was more like 16 million in my mind, 17
21 million.
22     Q.  Okay, whatever number it is, 16, 17, you see
23 the shortfall accruing; right?
24     A.  Yes.
25     Q.  Had you taken any steps along the lines that

Page 373

1  you articulated just a few minutes ago to go like put
2  your foot down, you know, try to raise money to, you
3  know, decrease the shortfall?
4      A.  I visited Mr. Fertitta.  Like I say, he was
5  starting to have major heart valve problems, and he just
6  didn't have the energy, and I didn't feel like what he
7  needed was me to be burdening him.  But he said "Don't
8  worry about this" --
9      MR. HEJMANOWSKI:  We need to object on hearsay
10 as to what Mr. Fertitta said.
11     THE WITNESS:  That's fine.
12     MR. FERRARIO:  It goes to his state of mind
13 and why he did what he did.
14     ARBITRATOR PRO:  Yes.  Overruled.  I'll allow
15 it.
16     MR. FERRARIO:  Okay, go ahead.
17     A.  Yes, the answer to your question is my first
18 guy to go to was Mr. Fertitta and say, you know -- but,
19 like I say, I live across the way from him and I'm with
20 him all the time, and the last thing he needed was to be
21 burdened with this.  I think they went bankrupt
22 somewhere, you know, it was not going too good in the
23 casino business, so everything was disintegrating and,
24 you know, and I did talk to others, you know, Michael
25 Gaughan and different guys, and about the concept of,

Page 350

1   I understood you correctly, in terms of you committing
2   JATCO to do the job, you had those discussions with your
3   father; right?
4       A. Yes.
5       Q. Okay. And I take it as a result of those
6   discussions, you decided to go ahead and do the job?
7       A. Yes.
8       Q. And then you mentioned early on you were
9   involved on the fundraising side of things?
10      A. Yes.
11      Q. And then you thought that maybe -- if I
12  understood you correctly, when you shifted over to
13  agreeing to do the job, you kind of took yourself out of
14  fundraising?
15      A. No, but I was really more focused obviously --
16  here is something that I don't know if anybody can grasp
17  today, it's eight, ten years ago, the town was so busy,
18  there was so much going on that we couldn't even get an
19  electrical contractor of the size and capacity of this
20  job to bid it. I had to personally beg three people
21  to bid the electrical. It was a sophisticated
22  electrical job.
23      Q. It was a different time, the town is booming?
24      A. Yes, you couldn't even get -- I mean, the
25  worst think of taking on the job was we couldn't get

Page 351

1   workers. I couldn't get an electrical contractor. I
2   had no electrical bid, so I had to beg people as a
3   favor, and when you're begging a guy to give you a bid,
4   it's not going to be a very good bid, so I'm trying to
5   raise money from people, and I'm not really feeling good
6   that I'm getting -- but I've got to have a good guy on
7   the job on electrical because that's a cheap part of the
8   job, so you're kind of in a conundrum there begging
9   people that are capable to give you a price, and yet
10  trying to get the best price. So there was a lot going
11  on. But the fundraising had some big steps.
12      I was very instrumental in helping -- there
13  was an attorney, geez, I'm real close -- he was on Ralph
14  Engelstad's board, and he was on the foundation.
15      Q. Owen --
16      A. Owen Nitz. That's N-i-t-z. He was friends
17  with my father. I was friends with him through Tom
18  Wiesner in campaigns way before, and so he called me
19  because somebody had approached Mrs. Engelstad about --
20  and I think Ralph had just died, maybe a year or two
21  before, three years, something -- and I didn't even know
22  they had this foundation -- and he called me and wanted
23  to know what Frank Fertitta's family was naming after,
24  and what was available, and was I going to build it.
25  And so he had two or three meetings personally with me

Page 352

1   because he was one, I think, of three votes on that
2   foundation. So I spent quite a bit of time with him
3   trying to reassure him of like he wanted to maybe name
4   the Gorman gym.
5       And these things weren't -- and by the way, we
6   had a professional fundraising, Gorman did, the day it
7   hired -- I had nothing to do with it -- but I had seen
8   this type of thing on my two other ventures, and they
9   tell you if you get -- it's real simple, you know, you
10  get one guy to give half the money and then you get this
11  pyramid, and it sounds good until you get out there and
12  the guys tell you no, and it all collapses, so they get
13  their fee and they leave.
14      So he was somehow looking at that and wanted
15  to know what people had given, and he really was wanting
16  to get Ralph and Betty Engelstad's name on something
17  that was going to be well-known and prominent, and could
18  I assure him of that, and there was no bait and switch,
19  so I spent personal time with some people like that
20  had nothing to do with the construction. So yes and no.
21      Q. Okay. But I think from what you've just said,
22  you were on the fundraising side of things, and then
23  ultimately -- we'll get to the construction in a minute
24  -- but why was fundraising important? I mean, it seems
25  like kind of a basic question but I need to hear it from

Page 353

1   you. Wasn't that the source that paid for the
2   construction?
3       A. It was the only source. I mean, at one time
4   Pat Mulroy was one of the -- she ran the Water District,
5   Pat Mulroy, Las Vegas Water District. She was a good
6   Catholic, and her children had gone there, and they
7   recruited her, and I knew Pat because we did a lot of
8   work at the Water District, and so she had halfway
9   volunteered that in these general meetings they were
10  having with 20 or 30 people around that Gorman could get
11  bonds rather than a bank loan, or a combination, and she
12  was pretty good at that because she had gotten a lot of
13  public things for the Water District.
14      So a couple of her guys would come after work
15  and tell us things that you had to do. I really wasn't
16  involved, but I was, I was listening, and so they were
17  trying to put the financing together. If they could get
18  bonds and a bank loan -- there was a bank, I think
19  Allied --
20      Q. Allied Irish?
21      A. Allied Irish Bank, and they, from what I
22  understood, felt good about loaning to Catholic
23  projects, somehow their background. So I don't know who
24  brought them in, and they were visiting with us and
25  giving us ideas, and Pat Mulroy was there and they were

Arbitration Proceedings, Volume III     J.A. Tiberti Construction Co., Inc. v. Bishop Gorman Development Corporation

Page 370

1  out ahead of our skis -- I'm sorry, I wanted to know how
2  much we were out and ahead of our skis, is what I said,
3  before we could understand how much money we had to put
4  our foot down to get things or not do something, or have
5  a conversation with people how did they feel about it
6  and here's the numbers.
7      Q. Okay. So you're tracking the number to see --
8  I like your analogy -- how far out on your skis you're
9  getting; right?
10     A. Yes.
11     Q. And then at some point you anticipate you're
12 going to go to where to get the money, the donors?
13     A. Yes.
14     Q. Okay. And did that happen? Did you go to the
15 donors at the conclusion of the project? And we've all
16 agreed that basically at the end of the project it was
17 like a $22 million shortfall.
18     MR. HEJMANOWSKI: Excuse me. Remember
19 Mr. Tiberti left the company in 2009, which was the
20 conclusion of the project, so you need to narrow in on
21 the date if you're going to ask him if he was going
22 after donors.
23 BY MR. FERRARIO:
24     Q. You were aware of the shortfall; correct?
25     A. Not of -- I didn't know. These numbers

Page 371

1  weren't put together. They were getting put together
2  because we were wrapping up the project I think at the
3  end of -- during 2008 and '9, and like I say, my brother
4  came in and was going to get out of the company, the car
5  business was disintegrating, General Motors was going
6  bankrupt, the whole thing was going off the cliff
7  simultaneously at the time, and if you had told me that
8  all these things were going to happen, I would never
9  have even believed it, but we had to finish what we were
10 there in a way, and I think Mr. Fertitta was sick, and I
11 think my partner in the car business died in June.
12     Q. Of what year?
13        If we take '09 December as the time you
14 leave --
15     A. Yes.
16     Q. -- the management of the company?
17     A. Yes, but I think -- what would seven years ago
18 from right now be?
19     ARBITRATOR PRO: June of 2009.
20     A. Yes, I think that Dan Tobin died in -- I was
21 getting ready to leave on a boat trip -- I missed the
22 funeral -- our annual boat trip, and Dan Tobin died in
23 early June, and then a partner and friend of mine,
24 Robert Nagy, died in July of cancer, and I was down
25 visiting him, he had a wife and no children, and then

Page 372

1  Mr. Fertitta died in August. So it was like everything
2  was going down the cliff.
3        And then a partner in the car business, which
4  was a major thing, because he died unexpectedly, he had
5  a heart attack and died in bed that night -- he was fine
6  a week before -- and then my friend Robert Nagy who I
7  was partners with in some real estate things, he died in
8  July, and Mr. Fertitta died I think it's seven years ago
9  this August.
10       So it was like an avalanche going downhill of
11 everything.
12     Q. Right. I mean, the economy had crashed by
13 then?
14     A. Yes. I mean, they stopped a Stardust project
15 called Echelon. Everything just seemed to be just
16 completely crumbling around me, and it was just -- you
17 could hardly swim up and keep your head above water.
18       So my answer to your question is, I don't
19 think I ever saw in my mind it was 22 million. I
20 thought it was more like 16 million in my mind, 17
21 million.
22     Q. Okay, whatever number it is, 16, 17, you see
23 the shortfall accruing; right?
24     A. Yes.
25     Q. Had you taken any steps along the lines that

Page 373

1  you articulated just a few minutes ago to go like put
2  your foot down, you know, try to raise money to you,
3  know, decrease the shortfall?
4      A. I visited Mr. Fertitta. Like I say, he was
5  starting to have major heart valve problems, and he just
6  didn't have the energy, and I didn't feel like what he
7  needed was me to be burdening him. But he said "Don't
8  worry about this" --
9      MR. HEJMANOWSKI: We need to object on hearsay
10 as to what Mr. Fertitta said.
11     THE WITNESS: That's fine.
12     MR. FERRARIO: It goes to his state of mind
13 and why he did what he did.
14     ARBITRATOR PRO: Yes. Overruled. I'll allow
15 it.
16     MR. FERRARIO: Okay, go ahead.
17     A. Yes, the answer to your question is my first
18 guy to go to was Mr. Fertitta and say, you know -- but,
19 like I say, I live across the way from him and I'm with
20 him all the time, and the last thing he needed was to be
21 burdened with this. I think they went bankrupt
22 somewhere, you know, it was not going too good in the
23 casino business, so everything was disintegrating and,
24 you know, and I did talk to others, you know, Michael
25 Gaughan and different guys, and about the concept of,